Exhibit A

Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
FOLEY & LARDNER LLP
90 Park Avenue
New York, New York 10016
(212) 682-7474

Jon P. Christiansen
FOLEY & LARDNER LLP
777 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 297-5557



Attorneys for Petitioner Molson USA, LLC

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MOLSON USA, LLC,

        Petitioner,

  v.

JOHN G. RYAN, INC.,

        Respondent.

**JUDGE BAER**

Ca**07 CIV 6965**

## PETITION TO CONFIRM ARBITRATION AWARDS

      Molson USA, LLC ("MUSA"), by its undersigned attorneys, petitions the Court

to confirm certain arbitration awards and alleges as follows:

### PARTIES AND JURISDICTION

      1.    MUSA is a Delaware limited liability company. Its members are Coors

Brewing Company, a Colorado Corporation and Rathon Corp., a Delaware Corporation. MUSA

is a brewer and seller of beer products with an office and principal place of business in Golden,

Colorado.

2.     John G. Ryan, Inc. ("Ryan") is a New York corporation with an office and principal place of business in Pine City, New York. Ryan is in the business of beer and other beverage distribution.

3.     This court has jurisdiction over the parties under 28 U.S.C. §1332, in that the petitioner and the respondent are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Venue is proper in this court under 9 U.S.C. §9, in that the arbitration Awards that are the subject of this petition were rendered in this district.

### BACKGROUND FACTS AND PETITION

5.     MUSA and Ryan are parties to a 2001 Distributor Agreement ("the Distributor Agreement") (Exh. A). The Agreement contains an arbitration clause.

6.     MUSA commenced an arbitration proceeding before the American Arbitration Association against Ryan on July, 23, 2005, Case No. 15-181-00640-05 ("the Arbitration"). (Exh. B)

7.     The arbitration clause between the parties is specifically enforceable, having been the subject of a prior action in the United States District Court for the Eastern District of New York. *See John G. Ryan, Inc. v. Molson USA, LLC*, case no. 05-CV-3984(NGG)(JMA), 2005 WL 2977767 (Nov. 7, 2006)(Garaufis, J.)

8.     The American Arbitration Association appointed Attorney Peter Collins as an arbitrator in the Arbitration. Mr. Collins rendered preliminary and final awards in the Arbitration dated November 6, 2006 and July 13, 2007 (the "Awards," Exhs. C and D), pursuant to phased hearings agreed upon by the parties. The hearings were held and the Awards were rendered in the Southern District of New York.

2

9.    MUSA petitions this Court to confirm the Awards as valid and final

arbitration awards pursuant to 9 U.S.C. §9.

WHEREFORE, MUSA requests confirmation of the Awards based upon the this

petition and exhibits attached hereto.

Dated: New York, New York
      August 2, 2007

FOLEY & LARDNER LLP

Peter N. Wang (PW 9216)
Jeremy L. Wallison (JW 6707)
90 Park Avenue
New York, New York 10016
(212) 682-7474

-and-

Jon P. Christiansen
777 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202
(414) 297-5557

Attorneys for Petitioner Molson USA, LLC

3

# Exhibit A

# AMENDMENT TO DISTRIBUTOR AGREEMENT

THIS AGREEMENT ("Agreement") is entered into and made effective this 2nd day of January, 2001 by and between Molson 2000, LLC, a Limited Liability Company with its principal place of business in Bloomfield Hills, Michigan ("Company"), and **John G. Ryan, Inc.** , a ___O C R P O R A T I O N___ , with its principal place of business in Pine City, NY ("Distributor"), hereafter referred to together as "the parties."

## RECITALS

A.     The Company has acquired the right to import and sell Molson malt beverage products ("Importer Products") in the United States of America.

B.     Distributor has been a distributor of Importer Products in a specific territory for the Company's predecessor importer pursuant to a Martlet distributor agreement ("the Prior Martlet Agreement"), a Molson distributor agreement ("the Prior Molson Agreement"), a letter of appointment or some other form of distributor agreement with the predecessor importer to the Company (any of which shall be referred to as a "Prior Agreement").

C.     It is the desire of the parties to amend any prior distribution agreement, as described below.

## AGREEMENT

NOW THEREFORE, in consideration of the covenants and promises set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Agreement, Assignment and Release.

1.1.     If Distributor is a party to a Prior Martlet Agreement or a Prior Molson Agreement, Distributor agrees to the assignment of such prior agreement to the Company, as amended by this Agreement, for those Importer Products distributed by Distributor.

1.2.     If Distributor is a party to a letter of appointment, some other form of distributor agreement or if Distributor has no written agreement, Distributor agrees to the terms of the Prior Molson

**M000268**

Agreement attached hereto as Exhibit A, as amended by this Agreement, for those Importer Products distributed by Distributor.

1.3.    Distributor hereby releases all claims against all parties to the Prior Martlet Agreement, Prior Molson Agreement, letter of appointment or other form of distributor agreement and releases each of the following entities and each of their respective affiliates from all such claims relating to the existing distribution relationship: Miller Brewing Company, Foster's Brewing Group (USA), Fosters Brewing Group Limited, Molson USA, LLC [now known as Foster's USA, LLC], Molson Canada, Molson 2000, LLC, Molson Inc., Rathon Corp., and Martlet Importing Co., Inc.

2.    Sales and Logistics Management. Company has retained Coors Brewing Company ("Coors") to facilitate the sales and distribution of Importer Products under this Agreement and the assigned agreements. Distributor will:

2.1.    Market and sell Importer Products in cooperation with the promotions, programs and policies of Coors;

2.2.    Comply with Coors beer ordering system, billing system (EFT), sales reporting system and other Coors information reporting systems.

2.3.    Comply with the Company's procedures for shipment, delivery or pick-up of the Importer Products.

3.    Distributor Standards. The term "Quality Control Standards" in Paragraph 4 (d) of the Prior Martlet Agreement and the quality control and operations standards referred to in Paragraph 4(d) of the Prior Molson Agreement shall now refer to the Molson Distributor Standards Manual as hereafter formulated and amended from time to time by the Company.

4.    Additional Distributor Duties. Distributor shall:

4.1.    Achieve such reasonable performance goals as Coors and Company, with input from Distributor, may establish for Distributor from time to time and communicate in writing to Distributor.

2

M000269

4.2. Maintain wholesale inventories at levels recommended by Coors and Company.

4.3. Provide accurate and timely Product forecasts to the Company and Coors.

5. <u>Termination</u>. For five years from the date of this Agreement, Company will not terminate the Prior Agreement and this Agreement except for the events of default defined in paragraphs B(b) and B(c) of the applicable Prior Martlet Agreement or paragraphs 9(b) or 9(c) of the applicable Prior Molson Agreement, in each case as amended by this Agreement. Paragraph B(c) of the applicable Prior Martlet Agreement and paragraph 9(c) of the applicable Prior Molson Agreement are amended to add the following:

5.1. Intentional conduct by the managers or employees of Distributor in permitting the sale of Importer Products outside the quality standards set forth in the Molson Distributor Standards Manual.

5.2. If as a result of a transaction involving Distributor's business or as a result of action by one or more of Distributor's other suppliers, Distributor's revenues from beer products will be reduced by 25% or more.

6. <u>Dispute Resolution</u>. Paragraph 17(b) of the applicable Prior Martlet Agreement or paragraph 18(b) of the applicable Prior Molson Agreement is deleted and the following substituted therefor:

6.1. Except as set forth below, if any dispute between Distributor and the Company shall occur, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, such dispute shall be submitted by Distributor for informal mediation ("Mediation") of the dispute by the president of the Company (or his designee) within 30 days of the date the dispute shall first arise. The Company, but not Distributor, shall be bound by the decision of the mediator concerning the dispute. Mediation shall be a condition precedent to Distributor's right to pursue any other remedy available under this Agreement or otherwise available under law. The Company shall not be required to mediate any claim against Distributor for nonpayment of Distributor's outstanding account.

6.2. Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account,

3

M000270

including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association. Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred. Arbitration hereunder shall be in lieu of all other remedies and procedures, provided that either party hereto may seek preliminary injunctive relief prior to the commencement of such Arbitration proceedings.

7. <u>Notice</u>. Notices to the Company shall be sent to:

> Molson 2000, LLC
> C/O Coors Brewing Company
> Distributor Services, NH 511
> 17735 West 32nd Avenue
> Golden, Colorado 80401-0030

THIS AGREEMENT is executed by Distributor on the 29 day of January, effective as of the 2nd day of January, 2001.

John G. Ryan, Inc.

By: _Gerald J. Ryan_
   Gerald J. Ryan

THIS AGREEMENT is executed by the Company on the 27th day of June, 2005, effective as of the 2nd day of January, 2001.

Molson USA, LLC, as successor in interest to
Molson 2000, LLC

By: _____
   Vice President, Sales

4

M000271

**Exhibit A**

## MOLSON USA, LLC
### DISTRIBUTOR AGREEMENT

MOLSON USA, LLC ("Molson") agrees to sell and the undersigned Distributor agrees to buy and market those products listed on the Distributor Data Sheet attached hereto, pursuant to the following terms and conditions:

1.    Distributor's Representations.

Distributor represents and warrants that:

a.    Distributor has all permits and licenses necessary for Distributor to lawfully distribute Products in Distributor's Area as defined in Paragraph 2 below.

b.    Distributor has not paid nor agreed to pay any fee or monetary consideration or anything of value to Molson or for the benefit of any Molson officer, director, employee or representative with respect to the issuance of this Agreement.

In reliance on the above representations and warranties, Molson enters into this Agreement with Distributor.

2.    Distributor's Area.

a.    Molson hereby appoints Distributor as its sole distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the products listed in the Distributor Data Sheet ("Products"). It is understood that the Distributor's Area may be different for different Products. Unless Molson has granted its prior written approval, Distributor shall not sell or supply Products to any retail location within another authorized distributor's area nor to any person Distributor has reason to believe will sell or supply all or part of such Products to any retail location within another authorized distributor's area. Nothing in this subparagraph shall prevent Distributor from selling or supplying Products to another authorized Molson distributor for the purpose of eliminating Product shortages or inventory imbalances.

b.    The following provisions, rather than the provisions of subparagraph (a) above, shall apply whenever any of the provisions of subparagraph (a) above are expressly prohibited by any final court order or precluded by any applicable statute or regulation:

Molson hereby appoints Distributor as a distributor within the geographic area described in the Distributor Data Sheet ("Distributor's Area") for the products listed in the Distributor Data Sheet ("Products"). Distributor's primary responsibility shall be to comply with the Distributor obligations in accordance with this Agreement with respect to retail locations in Distributor's Area. If Distributor sells or supplies Products to retail locations outside Distributor's Area or to any person (other than an authorized Molson or Miller distributor) who Distributor has reason to believe will sell or supply all or part of such Products to retail locations

outside Distributor's Area, Distributor's obligations under Paragraph 4 of this Agreement shall extend to each such retail location. Distributor shall notify Molson immediately of all such sales in order to ensure effective monitoring of Distributor's compliance with all such obligations.

     c.    Except as otherwise specifically agreed to in writing by Molson, the grant of rights to Distributor shall not allow, and Distributor is prohibited from selling or supplying any Product to an exporter, embassy, foreign-bound carrier, duty-free store or ship chandler, and in no event shall Distributor sell or supply Products to anyone Distributor has reason to believe intends to sell, distribute or resell such Products outside of the United States. Molson reserves the right to sell to such persons directly or through commissioned agents or other persons or entities.

    3.    Management of Distributor.

     a.    Distributor agrees to have at all times a Manager approved by Molson who shall manage Distributor's business and vigorously promote and sell Products in accordance with this Agreement. The Manager shall be designated on the Distributor Data Sheet.

     b.    The Manager shall be qualified to perform all functions and duties necessary to manage Distributor's business and to comply with Distributor's obligations pursuant to this Agreement. The Manager shall be granted the authority by Distributor and shall exercise day-to-day operating control over the business and finances of Distributor, including implementation of the Business Plan.

     c.    Distributor may at its sole discretion terminate the employment of the Manager.

     d.    Molson may withdraw its approval of a Manager if Distributor or the Manager fails to comply with the provisions of subparagraph (b) above.

     c.    Distributor shall notify Molson in writing if the Manager becomes unable or ceases to manage Distributor's business, no later than ten (10) days from the occurrence of such event. Within sixty (60) days after Distributor ceases for any reason to have a Manager, Distributor shall submit to Molson a written application in the form provided by Molson requesting Molson's approval of a properly qualified candidate selected by Distributor for the then vacant Manager position. Molson shall be provided with all information reasonably related to the candidate's qualifications to serve as the Manager and shall have the right to interview the candidate.

     f.    Within forty-five (45) days after the date of receipt of Distributor's application for a new Manager, Molson shall notify Distributor of Molson's approval or disapproval of the proposed Manager, such approval by Molson shall not be unreasonably withheld. If Molson does not approve the proposed Manager, Distributor shall submit another application within sixty (60) days and the procedures described herein shall be repeated as often as necessary, provided that if a Manager is not approved within one hundred eighty (180) days after a vacancy has occurred, Molson shall have the right to terminate this Agreement in accordance with the procedures described in Paragraph 9(c). Any changes in the identity of the Manager shall be entered on the Distributor Data Sheet.

4.    Operation of Distributor.

a.    Distributor shall sell Products only to retailers and other persons to whom Distributor is duly licensed to sell such Products and shall otherwise comply with all valid laws, regulations and orders applicable to the sale of Products. Distributor shall maintain all permits and licenses necessary to distribute Products in Distributor's Area. Distributor shall submit to Molson, upon the request of Molson, copies of all such permits and licenses, subsequent amendments thereto, renewals thereof, and all applications for such permits, licenses, amendments or renewals.

b.    Distributor shall, by using its best efforts, vigorously and aggressively market and promote the sale of the full package line of Products in Distributor's Area. Distributor shall submit marketing plans to Molson upon Molson's request. Distributor shall use its best efforts to comply fully with any marketing plans and other commitments submitted by Distributor, shall adjust such plans from time to time to meet changing market conditions, and shall monitor the marketing activity of competing products. Unless Molson shall otherwise specify in writing: (i) Distributor shall follow a sales program that classifies accounts based on competitive volume surveys and establishes a sufficient frequency of calls to the retail accounts based upon the sales potential of each account; and (ii) Distributor shall utilize route books and maintain records that reflect sales made by Distributor to individual retail locations.

c.    Distributor shall maintain a balanced on-floor inventory at a level prescribed from time to time by Molson for the full package line of Products.

d.    Distributor shall take all necessary actions to ensure the quality control of Products in compliance with Molson's quality control and operations standards which are in effect from time to time. Those actions shall include, but not be limited to:

(1)    Observance of Molson's code-date requirements;

(2)    Proper stock rotation in the warehouse, vehicles and retail locations;

(3)    Proper handling and protection from damage of all Products, containers and dunnage;

(4)    Sales of Products solely out of inventory in Distributor's warehouse and on an oldest code-date-first basis, unless Molson shall otherwise approve in writing;

(5)    Maintenance of clean, operational warehouse(s);

(6)    Effective June 1, 2001:

(a)    Packaged Products shall be stored in a controlled temperature warehouse that is maintained between 38°F and 70°F;

(b)    Kegs of Product shall be stored in coolers that are set to maintain a temperature range of 36°F to 40°F, with the ideal temperature of 38°F; and

-3-

(c)    Warehouse temperatures must be monitored routinely and appropriate records of warehouse temperatures are to be maintained for periodic random evaluation by Molson personnel.

(7)    Implementation of a program in Distributor's Area for: (a) preventing Products bearing expired code-dates ("Overage Products") from reaching consumers; (b) retrieving Overage Products from retail locations; (c) replacing such products with fresh Products at no cost to the retailer; and (d) destroying promptly any damaged or Overage Products at no cost to Molson unless the overage or damaged condition was Molson's responsibility.

e.    Distributor shall preserve and enhance the high quality image, reputation and goodwill of Molson and Products.

f.    Distributor shall maintain complete and accurate records of orders and deliveries from Molson, as well as sales and inventory records, and Molson shall have access to such records. Distributor shall submit only complete and accurate notices, reports, claims, reimbursement requests, or other communications to Molson. Records for all transactions, including all price promotion allowance programs instituted by Molson, shall be maintained by Distributor for a minimum of three (3) years or as prescribed by state law, whichever is longer. Molson shall have the right to audit all such records. For any Molson price promotion allowance program, Distributor shall be required to file forms prescribed by Molson from time to time. Molson may audit any reimbursement claims filed by Distributor. In the event Molson finds errors greater than One Thousand Dollars ($1,000.00), or such other dollar amount set by Molson from time to time, Molson may calculate the percentage rate of error and using that percentage rate of error, extrapolate the amount owed to Molson for up to the prior three (3) years total reimbursement claims made by Distributor to Molson. Molson shall notify Distributor of the extrapolated audit results. Within thirty (30) days of such notice, Distributor must either pay the extrapolated amount to Molson or pay for the cost of a full audit by Molson or Molson's designee. Molson reserves the right to enforce other appropriate remedies, including those described in Paragraph 9 below.

g.    Distributor shall be open for business during all hours and days necessary to receive Products and to properly service retailers, including hours necessary to provide regular delivery of Products with sufficient frequency to prevent retailer out-of-stock occurrences, and maintain a qualified workforce of employees who are properly trained and adequately compensated to aggressively market and promote the Products.

h.    Distributor shall procure and distribute, and shall ensure the safe and proper handling, storage, placement and installation of Molson point-of-sale materials. Distributor shall display such materials in a conspicuous place at each retail location, and shall maintain records pertaining to their use. All such activities shall be as more particularly specified by Molson from time to time.

i.    Upon receipt of written notice from Molson, Distributor shall discontinue any advertising or promotional practices that Molson finds injurious to Molson's image or business or Products.

j.    Distributor shall purchase and maintain sufficient insurance coverage, shall pay all federal, state, and local taxes imposed on it, and shall use its best efforts to discharge promptly all debts incurred in the operation of its business.

k.    Distributor shall obtain and maintain the capability as may be specified from time to time by Molson to communicate electronically with Molson (e.g., by use of the Internet with required software) and Distributor shall use such communications as may also be specified from time to time by Molson. Distributor shall purchase and maintain electronic information systems software that is century date compliant and that is capable of: (i) electronic commerce with suppliers and retail customers; (ii) providing invoice level data to Molson; (iii) providing retail account classifications as designated by Molson; (iv) providing retail outlet locations (geocodes); (v) providing inventory status by SKU and by warehouse; and (vi) providing pricing information to Molson including front-line, promotional discounts, extended discounts and volume account discounts.

l.    Distributor shall: (i) submit a monthly Distributor forecast at the brand/package/alcohol level, and the aggregate of these forecasts for each reporting month must be within +/- 5% of current six month actual sales trends; (ii) have a route accounting system that is century date compliant; and (iii) maintain accurate and up-to-date account information, including properly identified account and volume classifications, account profiles, sales and distribution and geocodes as requested by Molson.

m.    Distributor shall maintain and submit the following information for a specified period, by a certain time, and in the appropriate form and media (manual or electronic) as requested by Molson; (i) sales information at the retail account invoice level and in summary form; (ii) account information; (iii) distribution information at the retail account level and in summary form; (iv) inventory and in-transit and forecast information; and (v) front-line, promotional, and retail pricing.

n.    Distributor shall prepare and submit to Molson, by January 1 of each calendar year, an annual business plan in a form and content acceptable to Molson ("Business Plan"), which shall include: (i) an executive summary; (ii) sales goals (annual and by month for total business and key channels); (iii) distribution goals (annual and by month for total business and key channels); (iv) retail service policy; and (v) sales and merchandising execution standards. Distributor and Manager shall implement the approved Business Plan, including preparation and implementation of detailed monthly sales plans, to achieve the goals established therein, comply fully with the Business Plan and other commitments made to Molson, and consult with Molson on adjustments to the Business Plan that may be needed from time to time to meet changing market conditions.

o.    Distributor shall maintain a minimum sales call frequency: (i) in off-premise accounts of twice per week in all accounts which comprise the top 20% of the industry volume in Distributor's Area and once a week in all other off-premise accounts; and (ii) in on-premise accounts of once a week in all accounts which comprise the top 50% of industry volume in Distributor's Area.

p.    Distributor is responsible for maintaining focus on the Products and directing appropriate resources to support the Products. Therefore, direction by Distributor to

-5-

the employees and resources utilized to sell, merchandise and market the Products shall be equal to or greater than that percentage of volume that the Products represent to the total volume of fermented malt beverages sold by Distributor. The employee sales commission (whether structured on a per case or per unit basis or on a percentage basis) for Distributor and supplier (or combined) funded commissions for any Product will be equal to or greater than that commission offered on a similar/like competitor product marketed or sold by Distributor.

        q.    At least every twelve (12) months during the term of this Agreement, Distributor will conduct a retail satisfaction survey that measures Distributor service in relation to the competition. The results of the survey will be submitted to Molson and opportunities identified will be addressed in the subsequent Business Plans.

        r.    Distributor shall comply with other provisions of this Agreement and shall observe all such other requirements as Molson may reasonably impose from time to time for the vigorous and aggressive marketing of Products.

    5.    <u>Agreement Term.</u>

        This Agreement shall commence on the date it becomes effective and shall remain in effect until terminated as described below.

    6.    <u>Ownership of Distributor.</u>

        a.    The prior written approval of Molson shall not be required for the sale, transfer or disposition of Distributor's business or any ownership interest therein to a family member, provided that: (i) such sale, transfer or disposition does not cause a substantial adverse financial effect on the business or operations of Distributor; and (ii) upon such sale, transfer or disposition, Distributor shall have a Manager approved by Molson. Any subsequent change in control of Distributor's business, as defined in Paragraph 5(b) below, shall require Molson's prior written approval, including the sale, transfer or disposition to a trust for the benefit of a family member. Family member is defined as the owner's spouse, child, grandchild, parent, brother or sister who is entitled to inherit the deceased owner's ownership interest under the terms of the deceased owner's will or the laws of intestate succession.

        b.    Except as provided in Paragraph 6(a), there shall be no change in the control of Distributor's business unless Distributor shall have obtained Molson's prior written approval. As used herein, "a change in control of Distributor's business" means any change in ownership interests, whether by one transaction or by the cumulative effect of several transactions with the same or different parties, which has the legal or practical effect of transferring the power to determine the Distributor's business policies. Such change in control shall include, but not be limited to, (a) any sale, transfer, change of ownership or other disposition in either the record or beneficial ownership of the following: (i) 10% or more of Distributor's voting stock; (ii) if Distributor is not incorporated, a 10% or more interest in Distributor's business; (iii) 10% or more voting stock of the corporation or entity which owns 50% or more of Distributor's voting stock; and (b) a change in the form of business entity presently used by Distributor (e.g., a change from individual ownership or a partnership to a corporation); and (c) the entering into or changing of any agreement transferring any of the powers to determine the policies under which Distributor's business shall be operated, including

a partner, shareholder, or member voting trust or voting agreement. Without Molson's prior written approval, there shall be no grant of stock options, establishment of trusts to hold stock in Distributor's business, nor execution of any agreements by one or more owners of Distributor which provides that, under certain circumstances, the interest of one of them in Distributor shall be sold or purchased by one or more of the owners. It shall be Distributor's responsibility to notify all of the owners of Distributor of the provisions of this Paragraph and to notify Molson promptly in writing of any sale, transfer, change of ownership or other disposition of an ownership interest in Distributor.

       7.     Transfer of Distributor's Business.

       Distributor shall have the right to sell, transfer or dispose of ("Convey") its entire business or any part of its business to an approved purchaser, except when such disposition results in the sale, transfer or disposition ("Transfer") of Distributor's rights or obligations under this Agreement, or results in the inability of Distributor to fulfill its obligations under this Agreement, in which event Distributor shall follow the procedures and comply with the conditions as set forth in this Paragraph.

       a.     Prior to any such Transfer, Distributor shall deliver to Molson a bona fide nonbinding letter of intent negotiated on an arm's length basis duly executed by Distributor and the proposed purchaser, which letter of intent shall be expressly made subject to Molson's rights described in this Paragraph and shall set forth all of the essential terms of the transaction, including the property subject to the Transfer; the consideration to be paid; the representations and warranties to be given by Distributor; and all other material terms and conditions which would be contained in a definitive purchase and sale agreement. Such letter of intent and a distributor application completed by the proposed purchaser shall be submitted to Molson within five (5) days after execution by Distributor of the letter of intent.

       b.     Upon receipt of the letter of intent, Molson shall have (during Distributor's normal business hours) access to and the right to inspect Distributor's business and its books and records, including its financial statements, appraisals, environment assessments, assets and liabilities, and Distributor shall cooperate in providing such data and information that Molson may reasonably request.

       c.     Upon receipt of the letter of intent, Molson shall have the irrevocable right and option to purchase Distributor's business or that part thereof which is the subject of the letter of intent upon those terms and conditions and for the purchase price (or, if such purchase price is not a liquidated cash price, for the equivalent cash value) contained in such letter of intent. Such terms and conditions shall be contained in a purchase and sale agreement to be duly executed by Distributor and Molson, if Molson exercises its right and option. Molson shall have thirty (30) days after receipt of the letter of intent and the information Molson may reasonably request (including appraisals and environmental assessments requested or commissioned by Molson) to exercise its right and option, which exercise shall occur when written notice is given to Distributor. If Molson exercises its right and option, Distributor shall promptly execute all documents reasonably required to Convey Distributor's business or part thereof to Molson.

       d.     If Molson does not exercise its right and option described in subparagraph (c) above, and Distributor has complied with all terms in subparagraph (c) above, Molson shall

have sixty (60) days from receipt of the completed distributor application to approve or disapprove the proposed purchaser and transaction. Distributor may Convey its business in accordance with the letter of intent subject to Molson's prior written approval of the proposed purchaser, which approval shall not be unreasonably withheld, and the purchaser's execution of the current form of this Agreement applicable to other authorized Molson distributors upon completion of the Transfer. Molson's approval (if given) shall be effective for a period of sixty (60) days after issuance (unless extended by Molson) and thereafter shall be null and void. Distributor shall promptly notify Molson of the completion of the Transfer. Molson shall notify Distributor in writing if Molson disapproves the proposed purchaser. The notice will include the reasons for the disapproval. If Molson disapproves the proposed purchaser, Distributor shall not Convey its rights under this Agreement or render itself unable to fulfill its obligations hereunder unless and until it obtains Molson's approval as described in this Paragraph.

      e.    As part of the completion of the Transfer described in this Paragraph: (i) Distributor shall pay all sums owed or to be owing to Molson; and (ii) Distributor and Molson shall execute a mutual release of all claims, of whatever nature, each party may have against the other, except where such claims may arise out of or result from a breach or default of any representation, warranty, covenant, agreement or obligation by Distributor that may be contained in the purchase and sale agreement entered into with Molson.

      f.    Molson may designate a third party who shall upon such designation be granted all of the rights and obligations granted to Molson under subparagraphs (a) through (e) above, provided that the mutual release described in subparagraph (e) above shall be entered into between Molson and Distributor.

    8.    <u>Distributor's Termination Rights.</u>

      Distributor shall have the right to terminate this Agreement at any time by giving Molson at least ninety (90) days' prior written notice. In such event, Molson's sole obligation to Distributor shall be the purchase of Distributor's inventory pursuant to Paragraph 10(c) below. If Distributor ceases business operations with respect to Products, Distributor shall be considered to have terminated this Agreement, effective as of the date operations cease.

    9.    <u>Molson's Termination Rights.</u>

      a.    Molson shall have the right to terminate this Agreement at any time by giving Distributor at least ninety (90) days' prior written notice.

      b.    Without waiving its rights under subparagraph (a) above, Molson shall have the right to terminate this Agreement if there is a default, breach or failure of the Distributor to comply with or perform any of the Agreement provisions, terms, obligations, warranties, covenants or representations, which is not cured: (i) within thirty (30) days after notice is given to Distributor of such condition; or (ii) within such longer notice and cure period as may be required by the then applicable law.

      c.    If any of the following events occur, Molson shall have the right to terminate this Agreement immediately upon the giving of written notice or after such longer period of notice as may be required under the then applicable law.

     (1)    Conviction of Distributor, the Manager or any of Distributor's owners of a felony;

     (2)    Distributor's fraudulent conduct or substantial misrepresentation in any of its dealings with Molson or with others concerning Products;

     (3)    Revocation or suspension of any of Distributor's federal, state or local licenses or permits for more than thirty-one (31) days, if such license or permit is required for the normal operation of Distributor's business;

     (4)    Distributor's insolvency or failure to pay monies due Molson in accordance with the terms of sale established by Molson;

     (5)    Any disposition of Distributor's business, change of control, or attempt to assign this Agreement in contravention to the terms of the Agreement;

     (6)    Distributor's violation of the provisions of Paragraph 2 of this Agreement;

     (7)    Distributor's failure to obtain Molson's prior written approval of a Manager within the time period described in Paragraph 3(f);

     (8)    Molson no longer has the right to sell Products in Distributor's Area; and

     (9)    Molson is enjoined from selling Products to Distributor.

     d.    Molson shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Molson contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who also have an agreement for servicing the Products. Molson shall incur no liability to Distributor by reason of such termination. In the event Molson exercises its right under this Paragraph and offers other distributors the right to enter into a new agreement or include the Products on an existing agreement, Molson shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

     e.    If Molson terminates this Agreement in accordance with the terms of subparagraph (a) above, Molson or its designee shall pay Distributor the lesser of: (i) the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to termination ("Termination Year") multiplied by the fraction the numerator of which is the Termination Year net gross profit and the denominator is the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to the beginning of the Termination Year; or (ii) the net gross profit earned by Distributor for the bona fide sale of Products during the Termination Year. For purposes hereof, "net gross profit" shall mean the period, less all costs of goods sold including the cost of deposits, spoilage, price promotions, Product purchases and taxes and less any credits, discounts or rebates received as a result of such sold Products. Such payments shall only be paid to

Distributor if Distributor executes a full release of all claims, of whatever nature, Distributor may have against Molson.

10.   Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

a.   Molson shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

b.   Within ten (10) days after such termination, Distributor shall return to Molson all property belonging to Molson in Distributor's possession or control. Molson shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Molson on any such property, Molson shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Molson to Distributor, reasonable wear and tear expected.

c.   Within ten (10) days after such termination, Distributor shall sell and Molson shall purchase Distributor's inventory of Products purchased after the date of this Agreement, F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following: the net price actually paid by Distributor to Molson for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Molson, plus the cost of transporting the inventory from Molson to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Molson), plus a handling charge to be set from time to time by Molson. In lieu of paying such repurchase price, Molson may, at its election, credit and offset the equivalent amount to Distributor's account.

d.   Molson shall have the right to terminate this Agreement at any time by giving Distributor thirty (30) days' written notice, provided that Molson contemporaneously gives such notice to all other Distributors located in the state or states in which the Distributor's Area is located, who also have an agreement for servicing the Products. Molson shall incur no liability to Distributor by reason of such termination. In the event Molson exercises its right under this Paragraph and offers other distributors the right to enter into a new agreement or include the Products on an existing agreement, Molson shall offer Distributor the right to enter into a new agreement upon substantially similar terms and conditions.

e.   If Molson terminates this Agreement in accordance with the terms of subparagraph (a) above, Molson or its designee shall pay Distributor the lesser of: (i) the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to termination ("Termination Year") multiplied by the fraction the numerator of which is the Termination Year net gross profit and the denominator is the net gross profit earned by Distributor from the bona fide sale of Products during the twelve-month period immediately prior to the beginning of the Termination Year; or (ii) the net gross profit earned by Distributor for the bona fide sale of Products during the Termination Year. For purposes hereof, "net gross profit" shall mean the proceeds realized from the sale of Products during the most recently ended twelve-month period, less all costs of goods sold including the cost of deposits,

spoilage, price promotions, Product purchases and taxes and less any credits, discounts or rebates received as a result of such sold Products. Such payments shall only be paid to Distributor if Distributor executes a full release of all claims, of whatever nature, Distributor may have against Molson.

10.    Post-Termination Provisions.

In the event this Agreement is terminated, the following provisions shall apply:

a.    Molson shall have the right to cancel unfilled orders and to stop or re-route any shipment en route to Distributor.

b.    Within ten (10) days after such termination, Distributor shall return to Molson all property belonging to Molson in Distributor's possession or control. Molson shall not be liable to Distributor for any expenses incurred by Distributor in connection with such property. If Distributor has placed a deposit with Molson on any such property, Molson shall refund such deposit to Distributor or credit an equivalent amount to Distributor's account when such property is returned in the same condition in which it was delivered by Molson to Distributor, reasonable wear and tear expected.

c.    Within ten (10) days after such termination, Distributor shall sell and Molson shall purchase Distributor's inventory of Products purchased after the date of this Agreement. F.O.B. Distributor's location and free and clear of all liens and encumbrances, at a repurchase price equal to the sum of the following: the net price actually paid by Distributor to Molson for the inventory, plus the amount of any taxes paid by Distributor in connection with purchasing the inventory from Molson, plus the cost of transporting the inventory from Molson to Distributor's warehouse (minus any freight charges that Distributor would have incurred in returning empty returnable containers to Molson), plus a handling charge to be set from time to time by Molson. In lieu of paying such repurchase price, Molson may, at its election, credit and offset the equivalent amount to Distributor's account.

d.    In no event with regard to a termination of this Agreement shall Molson be liable to Distributor for any special, indirect, incidental or consequential damages, nor shall Molson become liable to Distributor for any other loss, damage, expense, or investment of any kind whatsoever incurred as a result of the relationship contemplated by this Agreement.

11.    Terms of Sale.

a.    The prices charged by Molson to Distributor shall be the prices established by Molson in effect on the date of shipment.

b.    All sales by Molson to Distributor shall be on a cash basis or on such other terms of sale as Molson, in its sole discretion, may establish from time to time. Molson shall not be obliged to extend credit to Distributor or to assist Distributor in securing credit. Regardless of the method of payment, Molson shall retain a security interest in Products and containers delivered to Distributor until Molson receives full payment of all monies owed to Molson; unless Distributor has delivered to Molson an irrevocable letter of credit from a financial institution, in an amount, and in a form and content acceptable to Molson. Upon Molson's request, Distributor

-11-

shall execute such documents as are reasonable or necessary to perfect Molson's security interest. Except as may otherwise be requested by Molson, Distributor shall submit payments to Molson in accordance with electronic funds transfer protocol and terms as Molson may establish from time to time.

      c.    All kegs, computer software, dunnage and other assets owned by Molson shall remain the property of Molson and shall be returned to Molson in accordance with Molson's instructions.

      d.    Distributor shall be responsible for all federal, state and local sales, use, personal property, inventory and other taxes that may be assessed against Distributor on any Products or other Molson property in Distributor's possession at the time such tax is assessed or determined. Distributor shall also be responsible for any local, state and federal excise taxes on the shipment of Products to Distributor to the extent that such excise taxes are not included in Molson's prices.

12.    Financial Planning and Reporting.

      a.    Distributor shall furnish to Molson upon the execution of this Agreement and thereafter annually within one hundred and twenty (120) days after the end of Distributor's fiscal year, year ending operating and financial statements (including income statements, statements of cash flow, and balance sheets in a manner and format acceptable to Molson). All such statements shall be truthful and prepared with generally accepted accounting principles.

      b.    Molson shall have the right, after appropriate notice and at reasonable intervals, to inspect Distributor's financial, accounting, sales and inventory records.

      c.    Any financial data obtained by Molson pursuant to this Paragraph shall be treated by Molson and its employees as confidential information and shall not be disclosed to any other party without Distributor's written consent, unless such disclosure is compelled by a court or governmental agency and Molson has provided prior written notice of such disclosure to Distributor.

13.    Rights Reserved to Molson.

      a.    All orders for Products placed by Distributor shall be subject to Molson's acceptance. Molson shall have the right to specify the forms, procedures and processes (including electronic ordering systems) governing the placement and payment of such orders, including, the designation of the carrier, source, and the routing to be used for delivery of such accepted orders. In the event that Molson is restricted in the importation, sale or delivery of its Products by capacity limitations, acts of governmental authority, strikes or any other cause, natural or otherwise, beyond Molson's control, Molson shall not be compelled to honor previously accepted orders, but shall distribute available Products among distributors in a fair and equitable manner.

      b.    Molson reserves the unqualified right to manage and conduct its business in all respects and shall be free at all times to maintain or alter the formula, ingredients, labeling or packaging of the Products; to determine the prices and other terms on which it sells Products;

-12-

to produce or sell any particular brands; and to discontinue the sale of any of its Products, packages or containers in any geographic area.

14.    Molson Trade Designation.

a.    Distributor hereby acknowledges Molson's exclusive ownership, license rights and/or other rights in the various trademarks, trade names, service marks, trade dress and other trade designations (collectively "Trade Designations") relating to Molson's business or Products. Molson hereby grants Distributor a nonexclusive, non-assignable, non-licensable privilege to use Molson Trade Designations only in a lawful manner and in connection with the distribution, advertising, display and sale of Products. This privilege shall terminate upon termination of this Agreement. Such Trade Designations shall be used only in manners, forms and contexts specified or approved in writing by Molson, and upon Molson's request, Distributor shall discontinue the way in which Distributor uses any Molson Trade Designation. Distributor agrees that it shall not manufacture or have manufactured any merchandise bearing such Trade Designations without Molson's prior written approval.

b.    Distributor agrees to remove all Molson Trade Designations affixed in any fashion to property owned or controlled by Distributor (including vehicles, equipment and office supplies) before leasing, selling or otherwise transferring such property or control thereof to another person or before putting such property to any use not connected with the distribution of Products.

15.    Assignments.

Except as provided in Paragraph 6(a), any transfer, sale, assignment, or delegation of this Agreement or of any rights or obligations under this Agreement by Distributor, in whole or in part, whether by operation of law or otherwise, shall be null and void, unless Molson has given its prior written approval. Nothing herein shall prevent Molson from assigning all or part of its rights or obligations under this Agreement.

16.    New Molson Products.

This Agreement shall extend only to the brands of Products listed on the Distributor Data Sheet. Molson and Distributor may at any time agree in writing to extend this Agreement to other products, in which case the names of such other products shall be entered on the Distributor Data Sheet, provided Molson at its sole discretion reserves the right not to offer any other Molson product to Distributor.

17.    Amendments to Agreement.

a.    Molson may at any time propose an amendment to this Agreement if such amendment is applicable to all other distributors located in the state or states in which the Distributor's Area is located who also have an agreement for servicing the Products. Distributor shall indicate its acceptance of any such amendment by returning two (2) executed copies thereof to Molson. The amendment shall become effective on the date executed by Molson, who shall retain one (1) executed copy of the amendment and shall return the other executed copy to Distributor. If Distributor does not return an executed amendment to Molson within ninety (90)

-13-

days after the proposed amendment is submitted to Distributor, this Agreement shall immediately terminate without liability to either party.

        b.      The provisions of subparagraph (a) above shall not apply to changes made by Molson to the Distributor Data Sheet that are specifically permitted in this Agreement. Distributor shall notify Molson immediately of any changes applicable to it. Except as otherwise provided in this Agreement, no change in the Distributor Data Sheet by one party shall alter the other party's rights or obligations hereunder, unless the other party shall have given its prior written approval.

      18.    Compliance with Law, Venue.

        a.      The illegality or unenforceability of any provision of this Agreement shall not impair the legality or enforceability of any other provision. The laws, rules and regulations of the jurisdiction in which Distributor conducts its business are hereby incorporated in this Agreement to the extent that such laws, rules and regulations are required to be so incorporated and shall supersede any conflicting provision of this Agreement. If required by applicable law, Molson and Distributor may enter into an amendment of this Agreement for the sole purpose of complying with such law.

        b.      Any action, claim, suit or proceeding between Molson and Distributor or any owners of Distributor, whether based on federal, state statutory or common law, including but not limited to, any and all disputes relating to, arising out of or in connection with the interpretation, performance or nonperformance of this Agreement and any and all disputes arising out of or in connection with transactions in any way related to this Agreement (including the termination of this Agreement) shall be litigated solely and exclusively before the United States District Court whose district includes the location of Distributor's principal place of business. The parties consent to the in personam jurisdiction of said court for the purposes of any such litigation and waive, fully and completely, any right to dismiss and/or transfer any action pursuant to 28 U.S.C. Section 1404 or 1406 (or any successor statutes) or the doctrine of forum non conveniens. In the event the United States District Court does not have subject matter jurisdiction of said matter, then such matters shall be litigated solely and exclusively before the appropriate state court of competent jurisdiction located in the municipality or district where Distributor's principal place of business is located, and the parties consent to the personal jurisdiction of such courts for the purpose of such litigation.

        c.      Molson, Distributor and the owners of Distributor waive any right to trial by jury with respect to any claim or action relating to or arising from this Agreement or any action or omission of any signatory hereto (or its subsidiaries or affiliates) in connection with the transactions contemplated by this Agreement.

      19.    Notice.

        All notices that are required or permitted to be given under this Agreement shall be in writing, duly signed by the party giving such notice, shall be transmitted either by personal delivery, by telecopy or by registered or certified mail, with return receipt and postage prepaid, and, depending upon the means of transmittal, shall be effective when delivered, telecopied or mailed. All telecopied notices shall also require a copy to also be mailed, postage prepaid to the

addressee. Notices shall be addressed: (a) if to Distributor to the address of Distributor set forth after Distributor's signature to this Agreement; or (b) if to Molson, to 3939 West Highland Boulevard, Milwaukee, Wisconsin 53208. Telecopies shall be sent to the number described in the Distributor Data Sheet and to Molson at such number as Molson shall designate. The address or telecopy number of either party may be changed by notice to the other party given pursuant to this Paragraph.

     20.   Miscellaneous Provisions.

         a.   "Prior written approval" as used in this Agreement requires a communication signed by a corporate officer of Molson.

         b.   "Authorized Molson distributor" as used in this Agreement shall mean a distributor who is party to a written distributor agreement with Molson for Products which is currently in effect.

         c.   No representation, promise, inducement or statement of intention other than those set forth in this Agreement and the attached Distributor Data Sheet has been made by Molson or Distributor and neither party shall be bound by or liable for any other alleged representation, promise, inducement or statement of intention. Upon this Agreement becoming effective as defined in Paragraph 5, all previous agreements and understandings, whether oral or written, between Distributor and Molson, Martlet Importing Co., Inc. or Century Importers, Inc., parent and affiliates of Molson and the predecessor owner of the Products are hereby terminated. Distributor releases owner of the Products, and their respective parent and affiliates from any and all obligations or liabilities under such previous agreements and understandings, provided that Distributor shall remain obligated to pay any amounts due under such previous agreements or understandings. This Agreement contains the entire understanding between the parties with regard to the subject matter contained herein.

         d.   The failure of either Molson or Distributor at any time or times to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision and shall not affect the right of that party at a later time to enforce each and every such provision.

         e.   Except as specifically provided for in this Agreement, no person, including any officer, agent or employee of Molson, has any authority to amend, modify, waive, supersede or cancel this Agreement or any terms or provisions of this Agreement. No conduct of any such person shall be construed to create that authority.

         f.   Distributor acknowledges that it is, and shall remain, an independent business entity. Molson and Distributor are not joint venturers or partners, and neither may act as the agent, employee or fiduciary of the other.

     21.   Acknowledgements.

         The undersigned, in their personal or representative capacities, acknowledge that they have read this Agreement in full and have had an opportunity to review it with counsel; that they understand and agree to each of the foregoing provisions; and that they are duly authorized to sign the Agreement.

This Agreement is effective on the ___ day of _____, _____.

_____
Name of Distributor
(Sole Proprietorship, Partnership, Corporation, L.L.C.*)

By:_____(SEAL)
    (Owner, Member, Partner, President)

CORPORATE
SEAL

By:_____(SEAL)
    (Owner, Member, Partner, Secretary)

By:_____(SEAL)
    (Owner, Member, Partner)

By:_____(SEAL)
    (Owner, Member, Partner)

MOLSON USA, LLC

By:_____

Title:_____

CORPORATE
SEAL

By:_____

Title:_____

-16-

# Exhibit B

# AMERICAN ARBITRATION ASSOCIATION
## COMMERCIAL ARBITRATION RULES
### DEMAND FOR ARBITRATION

*MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you would like the AAA to contact the other parties to determine whether they wish to mediate this matter, please check this box.* ☐
*There is no additional administrative fee for this service.*

| TO: Name<br>John G. Ryan, Inc. | Name of Representative (if known) | Name of Firm (if applicable)<br>Foley & Lardner |
|---|---|---|
| Address<br>14 Kent Rd. | Representative's Address | |

| City<br>Pine City | State<br>New York | Zip Code<br>14871 | City | State | Zip Code |
|---|---|---|---|---|---|

| Phone No.<br>607-773-4646 | Fax No.<br>607-733-4054 | Phone No. | Fax No. |
|---|---|---|---|

The named claimant, a party to an arbitration agreement contained in a written contract, dated <u>January 2, 2001</u> providing for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

Is THIS A DISPUTE BETWEEN A BUSINESS AND A CONSUMER?      Yes ☐    No ☒

THE NATURE OF THE DISPUTE

See Attached Exhibit A

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any)

See Attached Exhibit A

DOES THIS DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP?      YES ☐    NO ☒

IF THIS DISPUTE ARISES OUT OF AN EMPLOYMENT RELATIONSHIP, WHAT WAS/IS THE EMPLOYEE'S ANNUAL WAGE RANGE? Note: this question is required by California law.

☐ Less Than $100,000      ☐ $100,000 - $250,000      ☐ Over $250,000

TYPES OF BUSINESS

Claimant  Beer Importer                              Respondent  Distributor

HEARING LOCALE REQUESTED

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its <u>Syracuse, N.Y.</u> office, with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement within fifteen days after notice from the AAA.

| Signature (may be signed by a representative) | Title<br>Attorney | Date |
|---|---|---|

| Name of Claimant<br>Molson USA, LLC | Name of Representative<br>Jon P. Christiansen | Name of Firm (if Applicable)<br>Foley & Lardner |
|---|---|---|

| Address (to Be Used in Connection with This Case)<br>See Attachment A | Representative's Address<br>777 E. Wisconsin Avenue | |
|---|---|---|

| City | State | Zip Code | City<br>Milwaukee | State<br>WI | Zip Code<br>53202 |
|---|---|---|---|---|---|

| Phone No. | Fax No. | Phone No.<br>414-297-5557 | Fax No.<br>414-297-4900 |
|---|---|---|---|

TO BEGIN PROCEEDINGS, PLEASE SEND TWO COPIES OF THIS DEMAND AND THE ARBITRATION AGREEMENT, WITH THE FILING FEE AS PROVIDED FOR IN THE RULES, TO THE AAA. SEND THE ORIGINAL DEMAND TO THE RESPONDENT.

FORM_999.9714.1 [PDF]

EXHIBIT A TO ARBITRATION DEMAND

*Molson USA, LLC v. John G. Ryan, Inc.*

**Nature of the Dispute**

1. The Claimant Molson USA, LLC ("Molson") was formerly known as Molson 2000, LLC. In 2001 it changed its name to Molson USA, LLC.

2. Through ownership of subsidiary entities, Molson is ultimately owned by Molson Coors Brewing Company. Molson Coors Brewing Company is the owner of Coors Brewing Company, a brewer of numerous Coors products.

3. Molson entered into a Distributorship Agreement (the "Agreement") with the Respondent John G. Ryan, Inc. ("Ryan") effective January 2, 2001. The agreement was signed by Ryan on January 29, 2002 after Ryan had originally signed the Agreement under protest. The parties thereafter conducted their relations pursuant to the Agreement until the present time. Through clerical error, Molson did not sign the Agreement until June 27, 2005.

4. The Agreement contains a provision requiring all disputes, except as to payment, between Molson and Ryan to be arbitrated before the American Arbitration Association.

5. Molson has adopted a nationwide policy of consolidation, which is reasonable, non-discriminatory and essential.

6. Molson gave written notice of the adoption of this policy to all distributors in a March 11, 2005 letter. Ryan received this letter on March 15, 2005. This policy was the result of a desire by Molson to consolidate distributors, both to create fewer and more financially strong distributors and also to consolidate Molson product distribution with the distribution of Coors products.

7. Pursuant to Section 55-c of the New York Alcoholic Beverage Control Laws (the "NY Act"), Molson is entitled to terminate the Agreement with Ryan pursuant to Molson's policy of consolidation. Molson's policy constitutes "good cause" for termination of the Agreement.

8. Molson seeks an award in this arbitration:

    A. Declaring that Molson has the right to terminate the Agreement and any other claim of right to distribute Molson products under all applicable law;

       B.     Declaring that Molson has the right under all applicable law to appoint a distributor of Molson's choosing in the territory previously served by Ryan;

       C.     Determining the amount of compensation due to Ryan under section 7(a) of the NY Act by virtue of the termination of the Agreement.

9.     Upon obtaining such an award, Molson will be entitled to send to Ryan the notice of termination required by §55-c5(c) and the notice to affected brewers under §55-c2(e)(i)(A).

## Relief Sought

An award, as follows:

       A.     Declaring that Molson has the right to terminate the Agreement and any other claim of right to distribute Molson products under all applicable law;

       B.     Declaring that Molson has the right under all applicable law to appoint a distributor of Molson's choosing in the territory previously served by Ryan;

       C.     Determining the amount of compensation due to Ryan under section 7(a) of the NY Act by virtue of the termination of the Agreement.

## Contact Information

Attorneys for Molson LLC:

Jon P. Christiansen
Kimberly Shur
Foley & Lardner LLP
777 E. Wisconsin Ave.
Milwaukee, WI 53202
414-297-5557
414-297-4900 (fax)
Email: jchristiansen@foley.com

Molson USA LLC Representative:

William H. Beyer
Assistant General Counsel
Molson Coors Brewing Company
P.O. Box 4030
NH335
Golden, CO 80401-0030
303-277-7001
303-277-6517

4.2.     Maintain wholesale inventories at levels recommended by Coors and Company.

4.3.     Provide accurate and timely Product forecasts to the Company and Coors.

5.     Termination. For five years from the date of this Agreement, Company will not terminate the Prior Agreement and this Agreement except for the events of default defined in paragraphs 8(b) and 8(c) of the applicable Prior Martlet Agreement or paragraphs 9(b) or 9(c) of the applicable Prior Molson Agreement, in each case as amended by this Agreement. Paragraph 8(c) of the applicable Prior Martlet Agreement and paragraph 9(c) of the applicable Prior Molson Agreement are amended to add the following:

5.1.     Intentional conduct by the managers or employees of Distributor in permitting the sale of Importer Products outside the quality standards set forth in the Molson Distributor Standards Manual.

5.2.     If as a result of a transaction involving Distributor's business or as a result of action by one or more of Distributor's other suppliers, Distributor's revenues from beer products will be reduced by 25% or more.

6.     Dispute Resolution. Paragraph 17(b) of the applicable Prior Martlet Agreement or paragraph 18(b) of the applicable Prior Molson Agreement is deleted and the following substituted therefor:

6.1.     Except as set forth below, if any dispute between Distributor and the Company shall occur, including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, such dispute shall be submitted by Distributor for informal mediation ("Mediation") of the dispute by the president of the Company (or his designee) within 30 days of the date the dispute shall first arise. The Company, but not Distributor, shall be bound by the decision of the mediator concerning the dispute. Mediation shall be a condition precedent to Distributor's right to pursue any other remedy available under this Agreement or otherwise available under law. The Company shall not be required to mediate any claim against Distributor for nonpayment of Distributor's outstanding account.

6.2.     Any and all disputes between Distributor and the Company or its agent, Coors, except nonpayment of Distributor's account,

3

including without limitation a dispute as to whether the Company has grounds to terminate this Agreement, which disputes are not resolved by Mediation, shall be submitted to binding arbitration in the city nearest to Distributor in which there is a regional office of the American Arbitration Association, before a single arbitrator, in accordance with the Commercial Arbitration Rules and procedures of the American Arbitration Association. Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred. Arbitration hereunder shall be in lieu of all other remedies and procedures, provided that either party hereto may seek preliminary injunctive relief prior to the commencement of such Arbitration proceedings.

7.    Notice. Notices to the Company shall be sent to:

> Molson 2000, LLC
> C/O Coors Brewing Company
> Distributor Services, NH 511
> 17735 West 32nd Avenue
> Golden, Colorado 80401-0030

THIS AGREEMENT is executed by Distributor on the 29 day of January, effective as of the 2nd day of January, 2001.

John G. Ryan, Inc.

By:     J. Gerald Ryan
        Gerald J. Ryan

THIS AGREEMENT is executed by the Company on the 27th day of June, 2005, effective as of the 2nd day of January, 2001.

Molson USA, LLC, as successor in interest to
Molson 2000, LLC

By:     Geoff Molz
        Vice President, Sales

4

# Exhibit C

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
--------------------------------------------------------
MOLSON USA, LLC.

Claimant,                                          AAA Case No.: 15 181 00640 05

            v.

JOHN G. RYAN, INC.,

Respondent.
--------------------------------------------------------

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreement entered into between the above-named parties and dated January 02, 2001, and

having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby

issue my INTERIM AWARD, as follows:

## INTERIM DECISION

### DISCUSSION

An evidentiary hearing in this proceeding took place on July 17 and 18, 2006.

The parties have briefed the case comprehensively and both sides have submitted proposed

findings of fact and conclusions of law as well as objections to one another's findings and

conclusions. Accordingly, familiarity with the facts and the contentions of the parties is

assumed.

Molson USA, LLC ("Molson"), the Claimant herein, is a limited liability

company owned by Coors Brewing Company ("Coors") and Molson, Inc. It sells beer products manufactured by Molson, Inc., in Canada to the United States market. John G. Ryan ("Ryan") is a duly licensed wholesaler of beer and other alcoholic and non-alcoholic beverages in New York State and acts as a wholesaler of Molson products in New York pursuant to a written agreement (the "Agreement") sometimes referred to as the "Molson Amendment."[1]

Molson seeks a declaratory judgment declaring that Molson has the right to terminate the Agreement and appoint a distributor of its choosing, and determination of the amount of compensation due to Ryan by virtue of the termination. Ryan requests denial of the requested relief in all respects.

At issue is application of Section 55-c of New York's Alcoholic Beverage Control Law ("ABCL"). As Ryan has discussed in its pre-hearing submission, pursuant to the protective measures imposed under ABCL §55-c, a brewer may only terminate a distributor for "good cause", as it is narrowly defined by the Statute. So far as applicable here, the "good cause" requirement establishes standards that must be met by a brewer in order to justify termination of a distributor as part of a national or regional policy of consolidation. The portion of the statute relevant to the instant dispute provides as follows:

---

[1] While the "Molson Amendment" was by its express terms executed "effective as of the 2nd day of January, 2001," there is some uncertainty concerning the actual times of execution by the signatories. See Findings of Fact, Nos. 14 through 22, *infra*. However, it does not seem to be in dispute that the parties did business from 2001 onward operating under the terms of the Molson Amendment. See Finding of Fact No. 22, *infra*.

"Good cause" means and shall be limited to: (i)(A) The implementation by a brewer of a national or regional policy of consolidation which is reasonable, nondiscriminatory and essential. Such policy shall have been previously disclosed, in writing, in reasonable detail to the brewer's wholesalers, and shall result in a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand. All affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of such policy, and such notice shall be provided by the brewer implementing said policy. Further, an affected wholesaler who has actual knowledge of the intended implementation of such policy shall also notify each affected brewer. The term "affected brewers" means all other brewers with an agreement with an affected wholesaler who is a multiple brands wholesaler. The term "affected wholesalers" means wholesalers who may reasonably be expected to experience a loss or diminishment of a right to distribute a brand, in whole or in part, as a consequence of a proposed consolidation policy.

N.Y. ABCL §55-c 2(e)(i)(A).

Under the statutory language quoted above, in order for a consolidation policy to qualify as grounds for good cause for the termination of a New York distributor, a brewer seeking to terminate bears the burden of demonstrating that its policy meets the following requirements: (1) the consolidation policy will be implemented on a national or regional level; (2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional", will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in the states contiguous to New York, or if "national" the brewer's

3

implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

### This Proceeding Is Not Time-Barred

A preliminary issue is raised by Ryan's argument that this proceeding is time-barred by Subparagraph 6.2 of Paragraph 6 ("Dispute Resolution") of the Molson Amendment, which provides in relevant part:

> Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred.

Ryan contends that the present dispute arose during the first half of 2003, when Molson representatives attempted to "persuade or pressure" Ryan and other New York wholesalers into transferring or selling their distribution rights to the local Coors house, and therefore that the parties' agreed one-year limitation bars this proceeding, which was commenced on July 26, 2005. In so doing, he equates the present state of the dispute with what it was in 2003, framing the issue as (then as now) whether Molson had the right to consolidate Ryan and other New York distributors. However, while there is no doubt that disputes between Molson and its New York wholesalers including Ryan were erupting in 2003, it does not follow that *the facts that are the subject of this proceeding* were then in dispute. As Molson's counsel urges, there was no evidence at the hearing that Molson took any steps to terminate Ryan pursuant to the provisions of §55-c until the filing of the arbitration demand in this case, which seeks a declaratory judgment establishing that it may do so. Moreover, as Molson points out, even if the

4

parties had discussed whether Molson had or did not have the right to terminate, this would not trigger a dispute within the intendment of §55-c until some action were taken by Molson to actually pursue termination.

Accordingly, I conclude that this proceeding is not time-barred.

### The 2001 Amendments to ABCL §55-c Apply to This Case

The sale of alcoholic beverages in the State of New York, as elsewhere in the United States, is subject to comprehensive state regulation. Threshold issues are presented in this case by Section 55-c of New York's ABCL, which governs agreements between brewers and beer wholesalers. That statute was amended by the New York State legislature effective June 15, 2001, during the pendency of the Molson-Ryan Agreement. Molson contends that applying the provisions of ABCL §55-c as amended in 2001 would be unconstitutional since application of the amendment would impair an existing contract in violation of the Contract Clause of the United States Constitution.

In support of its contention Molson cites *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 843 (8th Cir. 2002), in which contractual terms within certain manufacturers' pre-existing dealership agreements dealing with farm equipment were held to have been Constitutionally impaired by a state dealership statute enacted after the contracts went into effect.

To the contrary, Ryan points to *Gural Wholesalers, Ltd. v. Miller Brewing Co.*, 196 Misc.2d 630, 751 N.Y.S.2d 679 (Sup. Ct. Suffolk Co. 2002), which applied the same test as that used by the *Janklow* court to reach an opposite result on its facts. While both cases are well-reasoned, *Gural* has the advantage of being a closer fit to the instant case since, unlike the *Janklow* case, it deals specifically with §55-c of New York's ABCL -- the statute here in issue --

5

and addresses precisely the identical issue, *i.e.*, whether the Contracts Clause bars application of the 2001 Amendments to an attempted termination of an agreement entered into prior to the Amendments, pursuant to a brewer's consolidation policy.

As Ryan argues in its Post-hearing Memorandum of Law, *Garal* held that the retroactive application of the amendment of §55-c did not violate the Contracts Clause because:

- The distribution, sale and consumption of alcoholic beverages are highly regulated, and there is no reasonable expectation of unaltered continuation of the regulatory scheme;

- The agreements were entered into after passage of the original §55-c in 1996 and Miller there (like Molson here) knew at the time it entered into the agreement that it could not terminate its distributors without good cause. Ryan argues that the Amendment did not add or alter what constitutes good cause, but only clarified what types of consolidations satisfied the good cause requirement, and that no contractual rights were impaired retroactively by applying the Amendment to the already existing agreement. This may seem a bit of a stretch, but it has the support of the *Garal* court, which expressly reached this conclusion concerning the same statutory language: "In the instant case, the Amendments did not create a right which did not exist before, but merely created, or expanded upon, a remedy for an antecedent right [Citation omitted.]." 193 Misc.2d 630, 751 N.Y.S. 2d 679.

- The statute and the Amendment are "remedial" in nature and should be applied retroactively to avoid undermining its remedial purpose;

- The changes are not "drastic" and do not rise to the level of "substantial

6

impairment"; and

- The Amendment was intended as curative legislation, to clarify the intent behind an existing statute, and is properly retroactively applied.

The rationale of the *Garal* decision appears to have application in the present case, and will be followed here.

### Application of the Dormant Commerce Clause to NYABC Section 55-e

Molson invokes the Commerce Clause of the United States Constitution to argue that application of the year 2001 amendment provisions to §55-e, requiring the contemporaneous reduction in the number of wholesalers, either on a national basis or in states contiguous to New York, is constitutionally invalid.[2] It points to two Supreme Court cases: *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986) and *Healy v. The Beer Institute*, 491 U.S. 324 (1989) in support of its argument.

Both cases dealt with state statutes requiring affirmations that local prices were no higher than the prices at which the products in issue were sold in other states, and both concluded that the state statutes were invalid under the Commerce Clause because of their "impermissible extraterritorial effect." (*Healy*, 491 U.S. 334). Citing its previous decision in *Brown-Forman*, the Court said:

> The [Twenty-first] Amendment did not immunize the State from the Commerce Clause's proscription of state statutes that regulate the sale of alcohol in other States.

---

[2] The Commerce Clause states: "The Congress shall have Power . . . To regulate Commerce . . . among the several States. . . ." U.S. Const., Art. 1 ' 8, cl. 3. "This Court long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce. [Citations omitted.]" *Healy v. The Beer Institute*, 491 U.S. 324, 326 n.1 (1989).

7

491 U.S. at 334.

The Court characterized its decisions concerning extraterritorial effects of state

economic regulation as standing "at a minimum" for the following propositions:

> First, the "Commerce Clause . . . Precludes the application of a state statute to
> commerce that takes place wholly outside of the State's borders, whether or not
> the commerce has effects within the State [Citations omitted.].
>
>       *       *       *
>
> Second, a statute that directly controls commerce occurring wholly outside the
> boundaries of a State exceeds the inherent limits of the enacting State's authority
> and is invalid regardless of whether the statute's extraterritorial reach was
> intended by the legislature.

491 U.S. at 336.

The Court's emphasis is on the practical consequences of the state legislation in

issue:

> The critical inquiry is whether the practical effect of the regulation is to control
> conduct beyond the boundaries of the State. [Citing *Brown-Forman*.]

*Ibid.*

Finally, the Court prescribes consideration of the way the challenged statute may

interact with regulatory measures taken by other states:

> Third, the practical effect of the statute must be evaluated not only by considering
> the consequences of the statute itself, but also by considering how the challenged
> statute may interact with the legitimate regulatory regimes of other States and
> what effect would arise if not one, but many or every State adopted similar
> legislation. Generally speaking, the Commerce Clause protects against
> inconsistent legislation arising from the projection of one state regulatory regime
> into the jurisdiction of another State. [Citation omitted]

*Ibid.*

A well-reasoned opinion following the Supreme Court's *Healy* decision and

8

dealing with the application of the Commerce Clause specifically to §55-c, *S.K.I. Beer Corp v. Baltika Brewery*, 2006 U.S. Dist. LEXIS 47513 (E.D.N.Y. July 13, 2006) has been recently published. In that case Judge Glasser of the Eastern District of New York interpreted the language "in this state" appearing in the definition of "(b)rewer" in §55-c(2)(b) to modify the entire phrase preceding it, thus narrowing its ambit to brewers engaged in the sale and delivery of beer "in this state." Importantly, as one of the grounds of his decision Judge Glasser held that the alternate proffered interpretation of this language "would run afoul of the dormant Commerce Clause." *Id.* at 6. The reasoning underlying this conclusion echoes the Supreme Court's *Healy* decision:

> The "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders whether or not the commerce has effects within the State." [Citing *Healy*.] "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." [Quoting *Healy*.]

*Ibid.*

Finding that "[the alternate interpretation] would impose New York's statutory regime for brewer-wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law" Judge Glasser elected to follow the rubric that "a court should construe legislative enactments to avoid constitutional difficulties if possible. [Citations omitted.]" *Ibid.* This led to the conclusion that since under the terms of the contract there in issue physical delivery of the beer was made at the Baltika brewery at St. Petersburg, Russia, no sale took place in the State of New York which would justify an application of §55-c.[3]

---

[3] Molson contends that the specific finding of the *Baltica* case that under the

9

Based on the foregoing, I find that the §55-c's requirement that "a national or
regional policy of consolidation" result in ". . . a contemporaneous reduction in the
number of a brewer's wholesalers not only for a brand in this state but also for a brand in
contiguous states or in a majority of the states in which the brewer sells the brand" (§55-c(2)(e)
(i)(A) (emphasis supplied) constitutes facially an effort to regulate "conduct beyond the
boundaries of the State" (*Healy*, 491 U.S. 336, quoting *Brown-Forman*), and therefore that this
portion of the statute is barred by the Commerce Clause.

### The Molson USA Consolidation Policy is
### Reasonable, Non-Discriminatory, and Essential

Molson asks rhetorically exactly what kind of consolidation could qualify as
reasonable and essential under §55-c if the Molson consolidation does not. While declaratory,
its argument points to a relevant consideration: in enacting §55-c, the New York legislature must
be deemed to have concluded that some consolidations *would* qualify as reasonable and essential.

While, admittedly, expressions of intent by individual sponsors and post-passage memoranda are
_____
terms of delivery there applicable delivery of the beer took place outside the State of New York
entitles it to dismissal here, and Molson "reserves the right" to introduce evidence at any
subsequent hearing that Ryan took delivery outside the State of New York. No evidence was
presented at the evidentiary hearing tending to show that delivery to Ryan took place outside
New York. In addition, Molson states in its Pre-hearing Memorandum (p. 3) that "Molson USA
ships Molson products to Ryan in New York." In light of the disposition below, it appears
unnecessary to reach Molson's argument on this point.

10

not reliable indicators of the intention of the entire legislature, see *Schrader v. Carney*, 188 A.D.2d 200, 206-207, 586 N.Y.S.2d 687, 691 (4ᵗʰ Dep't 1992), the introducers' memorandum suggests an intention to avoid "subjective, arbitrary, or retaliatory terminations." There has been no evidence in the present case that Molson's efforts to terminate the Ryan relationship have been actuated by such motivations. Perhaps more importantly, principles of statutory interpretation dictate an effort to interpret a regulatory statute to reach a result that is not unreasonable.

To the contrary, Molson has submitted unrebutted evidence of a good-faith effort to fashion its consolidation policy around compliance with the rather technical requirements of §55-c. Molson has further demonstrated the need to reduce costs because it has in fact lost substantial (*i.e.*, multimillion-dollar) sums in four of the last five years. See Finding of Fact No. 38, *infra*. In interpreting a statute governing commerce, it would seem unreasonable to reach without a very good reason a result imposing continued operation of a business for years at substantial annual losses.

The present decision is not the end of this matter. §55-c 7 of the ABC allows Molson to terminate its distributor agreement with Ryan only upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of its consolidation policy, together with fair and reasonable compensation for other damages suffered. In the event that the parties are unable to agree on the amount of that compensation, such compensation will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

11

### FINDINGS OF FACT

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006, hereby makes the following findings of fact.

1.  Molson beer products are brewed in Canada by Molson, Inc. and sold in the United States by Molson USA, LLC ("Molson USA"), which contracts with distributors to sell beer to both on-premise retailers (such as taverns and restaurants) and off-premise retailers (such as grocery stores and convenience stores). Molson is North America's oldest brewer, founded in 1786.

2.  Molson USA is a limited liability company owned by Coors Brewing Company ("Coors") and Molson, Inc. It began operating in 2001 for the purpose of distributing Molson beer products in the United States. (At the time Molson USA was known as Molson 2000, LLC. It subsequently changed its name to Molson USA, LLC)

3.  Beer is sold in the United States through what is referred to as a "three-tier" distribution system. A brewer sells to independent distributors (or wholesalers) who sell to retailers, both off-sale, such as liquor and grocery stores and on-sale, such as bars and restaurants. State law prevents a brewer from selling directly to retailers or from owning wholesalers. A brewer is only as good as its distributors, since the brewer relies upon distributors to get products to retailers.

4.  In today's market Anheuser-Busch has approximately a 50% share of the national market. Miller's national share is approximately 20%. Coors' national share is

12

approximately 10%. The national shares of Heineken and Corona are 3% and 4% respectively.

5.　　　There are multiple distributors in every market. Each distributor carries multiple brands. Since retail shelf space and beer taps are limited, there is intense competition among distributors for "distribution" of beer brands and packages, meaning the share of the retailer's facility. Wholesalers also want to get brands placed in preferred spots in the distributor's facility, such as high traffic areas. The bigger a supplier is within a distributor's business the more likely that the supplier will have a greater share of the distributor's attention, known in the industry as "share of mind."

6.　　　Prior to 2001, the distribution of Molson products in the U.S. was done by a subsidiary of Miller Brewing Company under joint venture with Molson, Inc.

7.　　　John G. Ryan, Inc. is a New York beer distributor with a principal place of business in Pine City New York. It currently is a distributor for Molson beer products and other brands, including Miller, Guinness, Bass, Sam Adams and Seagrams. Its territory for Molson products includes the New York counties of Chemung, Schuyler, Tompkins and parts of Steuben and Yates.

8.　　　Since 2001, when Molson USA took over the United States distribution of Molson products, Coors Brewing Company has assisted with the sales and marketing of Molson products in the United States.

9.　　　Coors began a national policy of consolidation in 1997, focused on obtaining economically viable distributors. In many cases, this involved joining Coors and Miller in the same distributor's portfolio.

10.　　In February, 2005, various Coors and Molson entities were combined into

13

what was loosely referred to as a "merger of equals." After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company.

      11.    In connection with the unwinding of the prior Miller Brewing Company distribution of Molson products, Molson USA promised Miller in 2000 that existing United States Molson distributors would be allowed the opportunity to continue distributing Molson and a provision of the distribution agreement would contain a provision by which Molson USA would not terminate without cause during the first five years.

      12.    In a meeting in Canada prior to the operation of Molson USA, Gerald Ryan heard Daniel O'Neil of Molson, Inc. assure distributors that they would not be terminated if they were performing. Mr. O'Neil did not indicate whether this position would be adopted by the proposed joint venture between Coors and Molson or for how long the status quo would continue.

      13.    Mr. Ryan did not testify that his distributorship did anything differently in the intervening six years that he otherwise would not have done in reliance on Mr. O'Neil's comments. Likewise Mr. Ryan did not testify that his distributorship elected not to do something that it would have done in reliance on Mr. O'Neil's comments.

      14.    When Molson USA started its operations following the termination of the Miller joint venture, Molson USA could not locate a prior distributorship agreement with Ryan. Therefore, Molson USA created a Molson Amendment for Ryan with a blank exhibit. This was the first written agreement between the newly formed Molson USA and Ryan.

      15.    Gerald Ryan signed the Molson Amendment "under protest" and returned the agreement to Coors on February 2, 2001 with a letter noting the protest. He did this after

consulting with counsel.

16.    Molson USA refused to accept the amendment with the protest. Counsel for Molson USA, Neal Peters, returned the Molson Amendment to Ryan on February 12, 2001 with a memo that indicated that Ryan should return the signed Molson Amendment with no alteration and without protest or not at all.

17.    Gerald Ryan then signed the Molson Amendment and returned it on March 1, 2001. Mr. Ryan, however, prepared a memo to file noting his protest, but also stating that the protest was not conveyed to Molson USA.

18    When Mr. Ryan sent the Molson Amendment back to Molson USA he intended to create a contract with Molson USA concerning the operation of his distributorship for Molson products.

19.    Molson USA does not know whether or not the Molson Amendment signed by Ryan was signed by anyone on behalf of Molson USA in 2001 or 2002. A search of the Molson USA records does not show one way or another.

20.    On October 28, 2002, Molson USA wrote to Ryan and offered Ryan the opportunity to sign an entirely new Molson distributorship agreement. In that letter, Molson USA acknowledged the previous receipt of Ryan's signed Molson Amendment. Molson USA has no record that Ryan ever signed the new Molson distributorship agreement.

21.    In June 2005, Molson USA discovered that it did not have in its files a Molson Amendment signed by both Ryan and Molson USA. Molson signed another copy of the Molson Amendment on June 27, 2005 and attached the signature page with the demand for arbitration. The full Molson Amendment was sent to Ryan on August 29, 2005

22.    Both Ryan and Molson USA did business from 2001 onward operating under the terms of the Molson Amendment.

23.    The Ryan agreement with Molson USA states that it is terminable without cause, except for the first five years during which termination is permitted only for cause and except for any statutory limitation or expansion of the right to terminate.

24.    When Molson USA began the importation and sale of Molson products in 2001, the joint venture partners Molson and Coors determined to consolidate, where possible, the distribution of Molson products into the Coors distribution network in the United States. This has been Molson USA's continuous policy since the formation of Molson USA.

25.    When Molson USA began, there were over 502 Molson distributors in the United States and of these, 65% were not also Coors distributors (referred to from time to time as "unaligned" or "Molson-only" distributors). As of the hearing, there were 452 total Molson distributors. From 2001 to July 18, 2006 the total number of Molson distributors decreased in 24 states. There were 8 states in which the total number of Molson distributors increased. In 19 states the number of Molson distributors stayed the same, but in 10 of these states there was only one distributor to begin with. Molson could not reduce its distributors to zero and still operate in those ten states. In the five states contiguous to New York, during this period, the total number of Molson distributors has decreased from 41 distributors to 24 distributors, while declining in three states and remaining the same in two states.

26.    In New York, the proposed termination of Ryan's distributorship agreement would not cause any reduction in the total number of Molson distributors, but the proposed termination of the other Molson-only distributors in New York would cause the total

16

number of distributors to decrease from nine to five.

27.    Molson USA used a number of tactics in carrying out its plan of consolidation. Beginning in 2001, Molson USA began attempting to persuade unaligned Molson distributors to voluntarily sell the Molson brands to the local Coors distributor. This process proved to be very successful. Over time, Molson USA also used the availability of new brands (although Ryan received all new brands) and the prospect of the appointment of a second Molson distributor (in one state) to encourage consolidation. Molson distributors in Michigan, Pennsylvania, New York and Ohio resisted voluntary consolidation.

28.    Molson USA implemented its consolidation program with consideration given to the fact that the company was also attempting to grow sales of the Molson brands in the United States. Molson USA sought to recover from the double digit declines the brand suffered during the period when the brands were distributed in the United States by Miller. Molson USA invested over 20 million dollars per year in promoting the Molson products. Sales of Molson products in New York constitute approximately 30% of Molson USA's sales of Molson products in the United States.

29.    Molson's consolidation plan included the targeting of specific groups of distributors for consolidation in each year. Originally, Ryan was not on the list of targeted distributors.

30.    "Targeting" a distributor referred to the focus and immediacy of the consolidation efforts for that distributor. If a distributor was not a target for a particular year, it did not mean that Molson USA did not wish to consolidate the brands of that distributor into the local Coors distribution house. Rather, given the business demands of selling Molson products,

17

ffff

ffff

spending and reduced the number of markets in which media spending would be done. Whether a distributor was aligned with Coors was a part of the decision making process concerning media spending. Ryan did not receive any media spending in his market in 2005 so there was no reduction in 2006. As to "tactical spending" (promotions, point of sale materials, and other similar in-market expenditures) each Molson distributor, including Ryan, regardless of whether the distributor was aligned or unaligned, was given the same amount of tactical spending in the distributor's market as had been allocated in 2005.

      35    In May, 2005 Dean Valdez of Molson Coors visited with Mr. Ryan in New York. Mr. Valdez indicated that as the result of the Molson/Coors merger, the likely support for Molson brands would be decreased because of an overall corporate decision to increase marketing support for Coors Light. He indicated that it would be an opportune time for Ryan to consider selling to the local Coors distributor because the value of the distributorship might fall as a result of declining brand sales. Valuation of beer distributorships is typically done on the basis of trailing 12 month performance. Mr. Ryan declined to sell the distributorship in response to Mr. Valdez's comments. There is no evidence that the decision to place more corporate resources in support of the Coors Light brand was done in order to have an effect upon the Molson consolidation or an effect upon New York Molson-only distributors, including Ryan.

      36.    This arbitration was commenced on July 22, 2005. This is a test case for Molson, rather than commencing simultaneous actions against all unaligned New York Molson distributors. Molson USA seeks an award declaring that under §55-c, Molson has the right to terminate its Distribution Agreement with Ryan pursuant to Molson USA's policy of consolidation.

19

37.    Molson USA informed all of the other New York Molson-only distributors that it was the intent of Molson USA to pursue similar termination proceedings with respect to each New York distributor in the event that Molson USA was permitted by the arbitrator to terminate Ryan as a Molson distributor, with an appropriate payment for the brands.

38.    Molson USA's financial statements show that it suffered financial losses, as follows:

39.    Consolidation of the Molson distribution into the Coors distribution houses has a number of substantial benefits. At the most elemental level, consolidation of the distribution of Molson into the Coors distributors has allowed Coors and Molson USA to have fewer personnel calling on fewer distributors. This has saved Molson USA and Coors several million dollars, apart from the benefits accruing from the merger between Coors and Molson. This reduction also permits field personnel to concentrate their efforts among fewer distributors, which means that there is more time to spend with each distributor.

40.    Molson Coors obtained costs savings, sometimes referred to as the synergies from the merger, but there were separate and distinct cost savings realized from the elimination of Molson USA employees in the Molson sales network attributable to the consolidation policy and not the merger. The head count for the Molson USA sales force went from 35 people calling on only Molson USA distributors to the current 15 people who are "fully integrated with Coors," meaning that they call on distributors for both Coors and Molson brands

in a network that is 85% aligned.

41.    Consolidation of the Molson and Coors brands in a single distributor also permits both Molson USA and the distributor to increase selling focus on the combined Molson/Coors brands because they constitute a greater overall share of the distributor's business. In the beer business, this is referred to as "share of mind," meaning the ability to convince the distributor to focus on the supplier's brands, instead of diluting efforts across the distributor's entire brand portfolio, which can involve dozens of different brands. For example, the distributor can offer joint promotions to retailers. Instead of having to spend a day with the Molson-only distributor, and then a day with the Coors distributor in the same market, the Molson Coors employees are thus able to serve both brands during a single visit and coordinate the various corporate programs with a single distributor. Also, in a single call the distributor can ensure that the Coors and Molson brands are fresh on the retailer's shelves, thus promoting the important freshness imperative for both Coors and Molson.

42.    Consolidation also assists in creating a larger portfolio for the Coors distributor so that the distributor is in a better position to convince retailers to devote greater shelf space or number of taps to the combined Coors/Molson products. The Coors distributor has an incentive to promote both products to a greater degree.

43.    Consolidation has also shown that over time (and on average) aligned Molson distributors outperform unaligned Molson distributors in sales of Molson products. Some unaligned Molson distributors may outperform some aligned distributors and during some periods the average sales performance of unaligned distributors may exceed that of aligned Molson distributors. Short term sales performance can be affected by several matters, including

21

such factors as weather, a hockey strike, or changes in performance by a relatively few number of distributors.

### CONCLUSIONS OF LAW

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006 hereby makes the following conclusions of law.

1.    Both by signed document and course of dealing the parties have manifested an intent no later than March, 2001 to be bound by the Molson Amendment, as embodied in Exhibit 88.

2.    Inasmuch as there is no evidence that Molson USA attempted to terminate Ryan or communicated to Ryan its intention to terminate the distributorship contract between them pursuant to §55-c prior to one year before the commencement of this arbitration proceeding, Molson USA has satisfied the terms of paragraph 6.2 of the Molson Amendment, which requires that a dispute be submitted to arbitration within one year of the date that the dispute first arose.

3.    The proposed termination of the distributorship agreement between Molson USA and Ryan is governed by the provisions of §55-c including the 2001 amendments to §55-c which were effective June 15, 2001.

4.    Molson USA's national plan of consolidation is "reasonable, nondiscriminatory and essential" within the meaning of §55-c.

5.    Molson USA's national plan of consolidation is nondiscriminatory because it has been in effect since 2001 and has been pursued steadily since that date. Molson's decision to

22

stage its consolidation efforts consistent with the limitations of state law and the need to operate its business does not constitute discrimination. Molson has stated its intention to pursue the termination of the remaining unaligned distributors in New York if termination is permitted in this arbitration. There is no contrary evidence suggesting otherwise and, thus, the commencement of this arbitration as a test case is not discriminatory within the meaning of §55-c. The term "nondiscriminatory" in the statute refers to the policy of consolidation and not to the staged implementation of the policy for legitimate business reasons.

6.      In interpreting the meaning of the terms "reasonable" and "essential" in §55-c, reference is made to cases interpreting the same terms in the Wisconsin Fair Dealership Law, Wis. Stat. §135.02(4)(a).

A.      The terms reasonable and essential must be construed together within the context of the statute. In order for a national plan of consolidation to be reasonable and essential under §55-c the brewer need not risk financial ruin if the plan is not implemented or completed.

B.      Instead, the plan of consolidation is reasonable if it is the product of the brewer's good faith rational business judgment, which can be shown if it is consistent with industry practice.

C.      In order to be essential, the plan of consolidation must be not merely incidental or desirable, but necessary for the proper functioning of a brewer's distribution network.

D.      Factors such as cost savings to Molson USA and its corporate parent Molson Coors Brewing Company, avoidance of financial losses, increases in distributor efficiency and focus on the Molson brands that contribute to increased revenues satisfy the

23

requirement that a plan be reasonable and essential.

7.      Section 55-c(3) requires that a beer distributorship agreement "may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided that brewer has acted in good faith." The statute defines good faith as "honesty in fact and the observance of reasonable commercial standards in the trade." In the context of this arbitration good faith is to be determined in connection with the decision to terminate and the implementation of the termination of Ryan.

      A.      A brewer does not fail to act in good faith in implementing a plan of consolidation over time. State law and the need to run a business permit a brewer to achieve its consolidation in stages.

      B.      A brewer also does not fail to act in good faith by utilizing lawful means to encourage consolidation, such as selectively awarding brands or planning to "dual" brands in a territory or monitoring sales performance.

      C.      Ryan has presented no evidence that Molson USA did not act with "honesty in fact" in connection with the implementation of the policy of consolidation.

      (1)      The 2000 remarks of Daniel O'Neil do not show dishonesty in fact on the part of Molson USA. Molson USA had yet to be formed. Moreover, Mr. O'Neil's statement does not constitute a promise of any type. Nothing about any statement by Mr. O'Neil of present intention on the part of Molson, Inc. has any impact on the honesty of Molson USA's decision to invoke §55-c nearly five years later. Even after the meeting with Mr. O'Neil, Ryan signed the 2001 Molson Amendment with the five year termination provision. Ryan has also not presented any evidence that it would have done anything different in reliance between the time of

Mr. O'Neil's remarks and the announcement by Molson USA of its policy of consolidation.

(2)     Molson USA's encouragement of Ryan to sell in May, 2005 was based upon a factual statement that Molson Coors' support for the Molson brands would decrease as part of an overall company strategy. Molson USA's statement that this would provide an opportune time for Ryan to sell since less marketing support could lead to lesser revenues was not false.

(3)     Molson USA's proposed statements to distributors as to future actions beyond the expiration of the "five year period" was an honest statement of intention, given the legal impediments to forced consolidation faced by Molson USA and the need to continue Molson USA's business with distributors. In any event, there is no evidence that Ryan was ever contacted and presented with these statements.

D.     Ryan has presented no evidence that Molson USA has acted contrary to the observance of reasonable commercial standards in the trade. The only evidence of commercial standards in the trade was provided by Molson USA concerning the consolidation by Stroh Brewing Company.

E.     Molson USA has acted in good faith concerning the termination of Ryan.

8.     Section 55-e requires that a brewer's policy of consolidation "shall have previously been disclosed, in writing, in reasonable detail to the brewer's wholesalers . . ." In addition, "[a]ll affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of the policy." The obvious purpose of these provisions is to provide adequate notice to distributors who will be terminated under the consolidation policy. The notice period is not a maximum period, but a minimum period.

25

A.    In this case, Ryan has been provided more than 90 days notice of Molson USA's policy. The policy was described in writing at least as early as 2003 as a result of correspondence between the attorneys for Molson USA and Ryan. The policy was described in reasonable detail because it is elementally simple: Molson USA desired that the Molson brands be represented by the local Coors distributor.

B.    In addition, Molson USA provided a description of its policy and notice of implementation in its letter of March 1, 2005, which was sent to Ryan and all other New York wholesalers.

C.    Finally, Ryan has also had notice of Molson USA's intent to terminate and the description of the policy by virtue of the arbitration demand in this case, which was filed in July, 2005. Molson USA has not terminated Ryan and more than 90 days have elapsed from the date of the commencement of the arbitration.

9.    Under §55-e, a brewer's policy of consolidation must "result in a reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of states in which the brewer sells the brand." The term "contemporaneous" must be interpreted in a reasonable fashion given the New York legislature's knowledge of the laws restricting terminations in nearly every other state. A brewer could not possibly accomplish consolidation through persuasion in a short time period. The evidence in this case suggests that a national policy of consolidation takes considerable time, given the restrictions of state law and the need to conduct ongoing business. Thus, "contemporaneous" in the context of §55-e means that consolidation is measured over the period of time that the consolidation policy is in effect.

10.    That portion of §55-c which conditions termination of a New York distributor on actions of the brewer outside of New York is not enforceable under the Dormant Commerce Clause of the United States Constitution. *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986); *Healy v. The Beer Institute, Inc.*, 491 U.S. 324 (1989). New York has made the operation of §55-c dependent upon the brewer's activities in other states, which has the practical effect of regulating commerce occurring wholly outside of the borders of the state of New York. The inability of Molson USA to compel or persuade distributors to consolidate in contiguous states or in a majority of other states would operate as an effective bar to the brewer's right to invoke the provisions of §55-c and this extra-territorial trigger is not permitted under the Commerce Clause.

11.    Even if the out-of-state conditions of §55-c were to be enforced, Molson USA has complied with the provisions of the Act.

A.    Molson USA's uncontested evidence showed that the number of Molson distributors in states contiguous to New York has been reduced since the adoption of the policy of consolidation by Molson USA. The statute uses the term "in contiguous states," to mean the total number of distributors in those states, not measuring the results in each state. At the commencement of the policy there were 38 Molson distributors in contiguous states and there were 28 distributors in contiguous states at the time of the hearing.

B.    In addition, on a national basis, Molson USA began its operations with only one distributor in each of ten states. Because a brewer may not be expected to reduce its distributors to less than one in any given state (given that a brewer may not sell direct to retailers, but must sell through a distributor), the calculation under 55-c should not consider these states.

27

Given this, Molson USA has used its consolidation policy to reduce the number of Molson distributors in a majority of the states of the United States, reducing the number of Molson distributors in 24 states, increasing or remaining the same in 17 states.

      C.     While the number of distributors in New York will not be reduced with the termination of Ryan and the splitting of Ryan's territory among two distributors (one of whom already carries the Molson brands), the implementation of Molson's consolidation policy in New York, as desired by Molson USA, will reduce the number of distributors from nine to five and thus complies with the provisions of §55-c pertaining to New York distributors.

      12.     Molson USA is entitled to an award declaring that it has the right under all applicable law to terminate its distributor agreement with Ryan upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with the fair and reasonable compensation for other damages suffered pursuant to §55-c 7. In the event of failure of the parties to agree to such compensation, such matter will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

_____Nov 6 2006_____
     Date

                              _____
                                    Peter M. Collins

I, Peter M. Collins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____Nov 6 2006_____
     Date

                              _____
                                    Peter M. Collins

Exhibit D

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION TRIBUNAL

---

MOLSON USA, LLC,

    Claimant,

vs.                                        Case No. 13 181 2798 05

JOHN G. RYAN, INC.,

    Respondent.

---

## AWARD, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

    I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated January 2, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

    The undersigned arbitrator rendered an award in Phase I of this arbitration proceeding concluding that Molson USA, LLC ("Molson USA") had adopted and implemented a plan of consolidation constituting good cause of termination of the distributorship agreement and relationship with the respondent, John G. Ryan, Inc. ("Ryan"). That award, dated November 6, 2006, is incorporated herein as a partial basis for the second phase of this proceeding to determine, pursuant to New York Consolidated Statutes 55-c7(a), the amount of compensation due to Ryan for the termination of Ryan's Molson distribution rights.

    Evidence was taken in this matter on April 26 and 27, 2007. Ryan presented documentary evidence and testimony of Andrew Christon and Jerry Ryan. Molson presented the

Page 1 of 7

testimony of William H. Beyer, Richard Carroll, Gary Styles, and Lamont Seckman. The parties

have each presented post-hearing memoranda and reply memoranda. Submissions in this

arbitration proceeding have been closed.

The final award in this matter shall include the following Findings of Fact and

Conclusions of Law.

## FINDINGS OF FACT

1. Both parties in this proceeding presented the testimony of expert witnesses

who valued the distribution rights of Ryan using a valuation methodology referred to by various

terms, but frequently by the term "discounted future cash flow" ("DFCF"). The methodologies

of Ryan's expert, Andrew Christon, and Molson's expert, Lamont Seckman, in calculating DFCF

were similar, but not identical.

2. Each expert's DFCF calculation was premised upon a projection of sales of

Molson products in Ryan's territory for a period of years into the future. Mr. Christon's period

was ten years, beginning January 1, 2007, and Mr. Seckman's period was for seven years

beginning on the same date. Neither expert was critical of the choice of the other's projection

period.

3. One of the key areas of dispute between the experts was the expected

performance of the Molson brands in Ryan's territory in the future. Mr. Christon projected that

Molson sales would essentially flatten out for the ten year projected period, while Mr. Seckman

projected a continued gradual decline in Molson sales during his projected period.

4. The evidence supporting Mr. Christon's view on future Molson performance

can be summed up in his phrase that the people running Molson Coors Brewing Company are

smart people and would not let future brand declines continue.

5. Mr. Christon also pointed to Molson's efforts to repackage the Molson product to appear more "Canadian." Molson contends that there is no evidence that these efforts have been or will be successful. However, it appears elementary that Molson would not have undertaken these efforts unless it hoped to benefit from them. While it may be difficult or impossible to forecast the magnitude of the improvement, the makeover effort may be expected to improve sales.

6. On the other hand, Molson produced substantial evidence suggesting that the downward trend of the Molson brand was likely to continue. Among the factors supporting this conclusion are Molson Coors Brewing Company's ("MCBC") concentration of spending and support on the key Coors Light, Keystone and Blue Moon brands, the concentration of Molson U.S. spending in metropolitan markets, the reduction of Molson SKUs ("stock-keeping units") and the upward change in the pricing of Molson products to import levels. This latter strategy would likely have a disproportionately negative effect in the more economically challenged areas of New York, such as Ryan's territory. While it is not known how much each or all of these factors will impact sales of Molson products in Ryan's market, cumulatively they appear likely to cause a continuation of the downward trend.

7. In the absence of proof showing the likelihood of positive change, the best guide for future performance is past performance. Therefore, I believe that Mr. Seckman's projections of volume are more likely to occur.

8. Both experts' calculations of DFCF reached an incremental profit calculation by subtracting the cost of goods sold and incremental costs that would be avoided by Ryan by the loss of the Molson brand rights. The future incremental lost profits were reduced by the application of a discount rate. Mr. Christon's discount rate was 11.17%, and Mr. Seckman's

discount rate was 14.59%. Both experts used a technique known as the "weighted average cost of capital" method of calculating their discount rate.

9. I find Mr. Seckman's calculation of the discount rate to be more credible and applicable to the present circumstances. A potential buyer of distribution rights for an individual brand is at a greater risk than the buyer of an entire distributorship, given the moderating effect of multiple brands within a distribution house, as some brands grow and others decline. The buyer of the distribution rights of an individual brand will expect a pay-back in a short period of time. Thus, even if the hypothetical buyer of the Molson distribution rights were to finance the entire purchase, over the projected DFCF period the balance of debt-to-equity invested in the brands more nearly approaches the 80% equity/20% debt assumed by Mr. Seckman in his model.

10. There was a dispute between the experts on how the "terminal value" calculation would be made. A terminal value calculation seeks to value the brand rights at the end of the projection period. Mr. Christon suggests that the volume number for the last year of the projection period should be used for the terminal value calculation. Mr. Seckman takes an additional year of declining performance to reach the next year, which is the beginning of the terminal value calculation. Molson introduced a text by McKinsey & Co. (Ex. M-30) supporting Mr. Seckman's view of the terminal value calculation. While Mr. Christon suggested that his methodology was supported by a noted expert in the field, he provided no documentation of this view. Therefore, I adopt Mr. Seckman's methodology.

11. Mr. Seckman also analyzed several other Molson brand sale transactions to do a "reality check" of his DFCF calculation. Mr. Christon did not examine any comparable transactions, even those in his company's database of transactions. The result of Mr. Seckman's examination of the Molson database (Ex. M-12) was to increase the valuation from his DFCF

calculations. It appears to me that other transactions could be useful as a reality check for the fair market value of the Molson brands.

12. There was evidence of other transactions also from a summary of Mr. Christon's database (Ex. M-26) and from an industry consultant, Joe Thompson (Ex. R-17). Each of these exhibits support Mr. Seckman's view of valuation.

13. In sum, I am convinced that the valuation proposed by Molson should be adopted in general for the purposes of my award in this arbitration. Mr. Seckman's report concludes with a range of values which, when rounded, range from a low of $700,00.00 (2.59 times 2006 gross profits) to $780,000.00 (2.90 times 2006 gross profits)(Ex. M-2, p. 22). Molson proposes a computation of value midway between the two, i.e. $740,000.00. Because I believe a valuation lower than 2.9 times 2006 gross profits would undervalue the distribution rights, I conclude that a value at the higher end of Mr. Seckman's range is appropriate here. Accordingly, I conclude that the fair market value of the Molson distribution rights held by Ryan is $780,000.00, the higher number in Mr. Seckman's range.

14. Ryan put on evidence of other damages that will be suffered by the distributor as a result of the proposed termination. Molson has agreed with Ryan's calculation that the out-of-pocket damages are $7,517.95.

## CONCLUSIONS OF LAW

1.      Ryan has the burden of proof in this phase of the hearing, including both the burden of going forward with the evidence and the risk of non-persuasion.

2.      Under New York law, expert testimony must be supported by an adequate factual basis and not be based upon conjecture or speculation. Here, Mr. Christon's projection of future sales as a part of his calculation of DFCF is based upon his speculation as to what

Page 5 of 7

MCBC's management and Molson's management will do in the future to reverse the trend of lower sales in Ryan's market and the larger beer marketplace. Because the opinion is based upon speculation, Ryan has failed in its burden of proof.

       3.     Even if Mr. Christon's opinion were considered to have an adequate basis in fact, I would conclude that in weighing all of the factors, including the credibility of witnesses, the likelihood of future events portrayed by both parties, Ryan's track record of Molson performance, and my assessment of the merits of the methodologies of both experts, Molson's projection of value better estimates the fair market value of Ryan's Molson distribution rights under §55-c7(a).

       4.     As to the determination of "other damages sustained" under §55-c7(a), I do not accept the argument of Ryan and Mr. Christon that the difference between Mr. Christon's valuation of Ryan's Molson distribution rights and his calculation of fair market value (resulting from the application of a lack of marketability discount) constitutes the type of damages contemplated by the New York legislature.

       5.     When the statute refers to "other" damages, it should be construed to refer to matters other than the value of the brand distribution rights, for which the legislature chose to define fair market value in §55-c2(i). Moreover, it would be illogical for a supplier to be required to pay more for the termination of the brands for good cause pursuant to the implementation of a national plan of consolidation (§55-c7(a)) than for an outright termination without cause (§55-c7(b).

       6.     Rather, in my view, the damages provided in addition to fair market value of the terminated brand distribution rights are those sunk costs which the distributor has been unable to recoup or will be unable to recoup after the termination of the brand distribution rights.

7.      Therefore, by applying §55-c7(a) to the facts I have determined in this case, the following is my declaratory award:

a.      Per my award of November 6, 2006, Molson is entitled under all applicable law to terminate its agreement with the respondent Ryan upon notice to Ryan and payment to Ryan in the amount of $787,517.95.

b.      Per the application of §55-c7(c), the costs and arbitrator compensation of this arbitration shall be divided equally between Molson and Ryan. Accordingly, the administrative fees of the American Arbitration Association totaling $5,000.00, and the compensation of the arbitrator totaling $86,318.00 shall be borne equally by the parties. Therefore, Ryan shall reimburse Molson the sum of $2,250.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Molson.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

_July 13, 2007_
Date

_Peter M. Collins_
Peter M. Collins

I, Peter, M. Collins, do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who has executed this instrument which is my Award

_July 13, 2007_
Date

_Peter M. Collins_
Peter M. Collins