# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
                                  :

MOLSON USA, LLC,                :

               Petitioner,    :       07 Civ. 6965 (HB)

-against-              :       **DEFAULT JUDGMENT**

JOHN G. RYAN, INC.,        :

              Respondent.  :
----------------------------------------------------X

This action having been commenced on August 3, 2007, by the filing of the Summons and Petition, and Respondent having waived service of the Summons and Petition on August 14, 2007, and Petitioner having filed such waiver of service on August 14, 2007, and Respondent not having answered the Petition, and the time for answering the Petition having expired, and the Clerk of the United States District Court for the Southern District of New York having certified Respondent's default on October 16, 2007, it is

ORDERED, ADJUDGED AND DECREED: That the Petition of Molson USA, LLC, to confirm the attached arbitration awards, dated November 6, 2006 and July 13, 2007 (the "Awards"), is granted and the Awards are hereby confirmed.

Dated: New York, New York
      October   , 2007

                                 _____

                                       U.S.D.J

                            This document was entered on the docket

                            on _____.

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
-------------------------------------------------------------

MOLSON USA, LLC,

Claimant,

      v.

JOHN G. RYAN, INC.,

Respondent.

-------------------------------------------------------------

AAA Case No.: 15 181 00640 05

  I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 02, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue my INTERIM AWARD, as follows:

## INTERIM DECISION

### DISCUSSION

  An evidentiary hearing in this proceeding took place on July 17 and 18, 2006. The parties have briefed the case comprehensively and both sides have submitted proposed findings of fact and conclusions of law as well as objections to one another's findings and conclusions. Accordingly, familiarity with the facts and the contentions of the parties is assumed.

  Molson USA, LLC ("Molson"), the Claimant herein, is a limited liability

company owned by Coors Brewing Company ("Coors") and Molson, Inc. It sells beer products manufactured by Molson, Inc., in Canada to the United States market. John G. Ryan ("Ryan") is a duly licensed wholesaler of beer and other alcoholic and non-alcoholic beverages in New York State and acts as a wholesaler of Molson products in New York pursuant to a written agreement (the "Agreement") sometimes referred to as the "Molson Amendment."[1]

Molson seeks a declaratory judgment declaring that Molson has the right to terminate the Agreement and appoint a distributor of its choosing, and determination of the amount of compensation due to Ryan by virtue of the termination. Ryan requests denial of the requested relief in all respects.

At issue is application of Section 55-c of New York's Alcoholic Beverage Control Law ("ABCL"). As Ryan has discussed in its pre-hearing submission, pursuant to the protective measures imposed under ABCL §55-c, a brewer may only terminate a distributor for "good cause", as it is narrowly defined by the Statute. So far as applicable here, the "good cause" requirement establishes standards that must be met by a brewer in order to justify termination of a distributor as part of a national or regional policy of consolidation. The portion of the statute relevant to the instant dispute provides as follows:

---

[1] While the "Molson Amendment" was by its express terms executed "effective as of the 2nd day of January, 2001," there is some uncertainty concerning the actual times of execution by the signatories. See Findings of Fact, Nos.14 through 22, *infra*. However, it does not seem to be in dispute that the parties did business from 2001 onward operating under the terms of the Molson Amendment. See Finding of Fact No. 22, *infra*.

"Good cause" means and shall be limited to:  (i)(A)
The implementation by a brewer of a national or
regional policy of consolidation which is
reasonable, nondiscriminatory and essential. Such
policy shall have been previously disclosed, in
writing, in reasonable detail to the brewer's
wholesalers, and shall result in a contemporaneous
reduction in the number of a brewer's wholesalers
not only for a brand in this state, but also for a brand
in contiguous states or in a majority of the states in
which the brewer sells the brand. All affected
wholesalers and affected brewers shall be afforded
ninety days prior notice of the implementation of
such policy, and such notice shall be provided by
the brewer implementing said policy. Further, an
affected wholesaler who has actual knowledge of
the intended implementation of such policy shall
also notify each affected brewer. The term "affected
brewers" means all other brewers with an agreement
with an affected wholesaler who is a multiple
brands wholesaler. The term "affected wholesalers"
means wholesalers who may reasonably be expected
to experience a loss or diminishment of a right to
distribute a brand, in whole or in part, as a
consequence of a proposed consolidation policy.

N.Y. ABCL. §55-c 2(e)(i)(A).

Under the statutory language quoted above, in order for a consolidation policy to

qualify as grounds for good cause for the termination of a New York distributor, a brewer

seeking to terminate bears the burden of demonstrating that its policy meets the following

requirements: (1) the consolidation policy will be implemented on a national or regional level;

(2) the policy is reasonable, (3) the policy is essential to the brewer; (4) the policy is non-

discriminatory; and (5) the brewer's implementation of the consolidation policy, if "regional",

will result in a contemporaneous reduction of the number of distributors for its brand both in

New York, as well as in the states contiguous to New York, or if "national" the brewer's

3

implementation of the consolidation policy will result in a contemporaneous reduction of the number of distributors for its brand both in New York, as well as in a majority of states in which the brewer's brand is sold.

### This Proceeding Is Not Time-Barred

A preliminary issue is raised by Ryan's argument that this proceeding is time-barred by Subparagraph 6.2 of Paragraph 6 ("Dispute Resolution") of the Molson Amendment, which provides in relevant part:

> Any and all disputes shall be submitted to arbitration hereunder within one year from the date the dispute first arose or shall be forever barred.

Ryan contends that the present dispute arose during the first half of 2003, when Molson representatives attempted to "persuade or pressure" Ryan and other New York wholesalers into transferring or selling their distribution rights to the local Coors house, and therefore that the parties' agreed one-year limitation bars this proceeding, which was commenced on July 26, 2005. In so doing, he equates the present state of the dispute with what it was in 2003, framing the issue as (then as now) whether Molson had the right to consolidate Ryan and other New York distributors. However, while there is no doubt that disputes between Molson and its New York wholesalers including Ryan were erupting in 2003, it does not follow that *the facts that are the subject of this proceeding* were then in dispute. As Molson's counsel urges, there was no evidence at the hearing that Molson took any steps to terminate Ryan pursuant to the provisions of §55-c until the filing of the arbitration demand in this case, which seeks a declaratory judgment establishing that it may do so. Moreover, as Molson points out, even if the

4

parties had discussed whether Molson had or did not have the right to terminate, this would not trigger a dispute within the intendment of §55-c until some action were taken by Molson to actually pursue termination.

Accordingly, I conclude that this proceeding is not time-barred.

### The 2001 Amendments to ABCL §55-c Apply to This Case

The sale of alcoholic beverages in the State of New York, as elsewhere in the United States, is subject to comprehensive state regulation. Threshold issues are presented in this case by Section 55-c of New York's ABCL, which governs agreements between brewers and beer wholesalers. That statute was amended by the New York State legislature effective June 15, 2001, during the pendency of the Molson-Ryan Agreement. Molson contends that applying the provisions of ABCL §55-c as amended in 2001 would be unconstitutional since application of the amendment would impair an existing contract in violation of the Contract Clause of the United States Constitution.

In support of its contention Molson cites *Equipment Manufacturers Institute v. Janklow*, 300 F.3d 843 (8th Cir. 2002), in which contractual terms within certain manufacturers' pre-existing dealership agreements dealing with farm equipment were held to have been Constitutionally impaired by a state dealership statute enacted after the contracts went into effect.

To the contrary, Ryan points to *Garal Wholesalers, Ltd. v. Miller Brewing Co.*, 196 Misc.2d 630, 751 N.Y.S.2d 679 (Sup. Ct. Suffolk Co. 2002), which applied the same test as that used by the *Janklow* court to reach an opposite result on its facts. While both cases are well-reasoned, *Garal* has the advantage of being a closer fit to the instant case since, unlike the *Janklow* case, it deals specifically with §55-c of New York's ABCL -- the statute here in issue --

5

and addresses precisely the identical issue, *i.e.*, whether the Contracts Clause bars application of the 2001 Amendments to an attempted termination of an agreement entered into prior to the Amendments, pursuant to a brewer's consolidation policy.

As Ryan argues in its Post-hearing Memorandum of Law, *Garal* held that the retroactive application of the amendment of §55-c did not violate the Contracts Clause because:

- The distribution, sale and consumption of alcoholic beverages are highly regulated, and there is no reasonable expectation of unaltered continuation of the regulatory scheme;

- The agreements were entered into after passage of the original §55-c in 1996 and Miller there (like Molson here) knew at the time it entered into the agreement that it could not terminate its distributors without good cause. Ryan argues that the Amendment did not add or alter what constitutes good cause, but only clarified what types of consolidations satisfied the good cause requirement, and that no contractual rights were impaired retroactively by applying the Amendment to the already existing agreement. This may seem a bit of a stretch, but it has the support of the *Garal* court, which expressly reached this conclusion concerning the same statutory language: "In the instant case, the Amendments did not create a right which did not exist before, but merely created, or expanded upon, a remedy for an antecedent right [Citation omitted.]." 193 Misc.2d 630, 751 N.Y.S. 2d 679.

- The statute and the Amendment are "remedial" in nature and should be applied retroactively to avoid undermining its remedial purpose;

- The changes are not "drastic" and do not rise to the level of "substantial

6

impairment"; and

- The Amendment was intended as curative legislation, to clarify the intent behind

    an existing statute, and is properly retroactively applied.

The rationale of the *Garal* decision appears to have application in the present case, and will be

followed here.

### Application of the Dormant Commerce Clause to NYABC Section 55-c

Molson invokes the Commerce Clause of the United States Constitution

to argue that application of the year 2001 amendment provisions to §55-c, requiring the

contemporaneous reduction in the number of wholesalers, either on a national basis or in states

contiguous to New York, is constitutionally invalid.[2]  It points to two Supreme Court cases:

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986)

and *Healy v. The Beer Institute*, 491 U.S. 324 (1989) in support of its argument.

Both cases dealt with state statutes requiring affirmations that local prices were no

higher than the prices at which the products in issue were sold in other states, and both

concluded that the state statutes were invalid under the Commerce Clause because of their

"impermissible extraterritorial effect." (*Healy*, 491 U.S. 334).  Citing its previous decision in

*Brown-Forman*, the Court said:

> The [Twenty-first] Amendment did not immunize the State from the Commerce
> Clause's proscription of state statutes that regulate the sale of alcohol in other
> States.

------------

[2]The Commerce Clause states: "The Congress shall have Power . . .To regulate
Commerce. . .among the several States. . . ." U.S. Const., Art. 1 ' 8, cl. 3.  "This Court long has
recognized that this affirmative grant of authority to Congress also encompasses an implicit or
'dormant' limitation on the authority of the States to enact legislation affecting interstate
commerce. [Citations omitted.]" *Healy v. The Beer Institute*, 491 U.S. 324, 326 n.1 (1989).

7

491 U.S. at 334.

The Court characterized its decisions concerning extraterritorial effects of state

economic regulation as standing "at a minimum" for the following propositions:

> First, the "Commerce Clause ... Precludes the application of a state statute to
> commerce that takes place wholly outside of the State's borders, whether or not
> the commerce has effects within the State [Citations omitted.].
>
>         \*      \*      \*
>
> Second, a statute that directly controls commerce occurring wholly outside the
> boundaries of a State exceeds the inherent limits of the enacting State's authority
> and is invalid regardless of whether the statute's extraterritorial reach was
> intended by the legislature.

491 U.S. at 336.

The Court's emphasis is on the practical consequences of the state legislation in

issue:

> The critical inquiry is whether the practical effect of the regulation is to control
> conduct beyond the boundaries of the State. [Citing *Brown-Forman*.]

*Ibid.*

Finally, the Court prescribes consideration of the way the challenged statute may

interact with regulatory measures taken by other states:

> Third, the practical effect of the statute must be evaluated not only by considering
> the consequences of the statute itself, but also by considering how the challenged
> statute may interact with the legitimate regulatory regimes of other States and
> what effect would arise if not one, but many or every State adopted similar
> legislation. Generally speaking, the Commerce Clause protects against
> inconsistent legislation arising from the projection of one state regulatory regime
> into the jurisdiction of another State. [Citation omitted]

*Ibid.*

A well-reasoned opinion following the Supreme Court's *Healy* decision and

8

dealing with the application of the Commerce Clause specifically to §55-c, *S.K.I. Beer Corp v. Baltika Brewery*, 2006 U.S. Dist. LEXIS 47513 (E.D.N.Y. July 13, 2006) has been recently published. In that case Judge Glasser of the Eastern District of New York interpreted the language "in this state" appearing in the definition of "(b)rewer" in §55-c(2)(b) to modify the entire phrase preceding it, thus narrowing its ambit to brewers engaged in the sale and delivery of beer "in this state." Importantly, as one of the grounds of his decision Judge Glasser held that the alternate proffered interpretation of this language "would run afoul of the dormant Commerce Clause." *Id.* at 6. The reasoning underlying this conclusion echoes the Supreme Court's *Healy* decision:

> The "Commerce Clause . . . precludes the application of a state statute to commerce that takes place wholly outside of the State's borders whether or not the commerce has effects within the State." [Citing *Healy*.] "The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." [Quoting *Healy*.]

*Ibid.*

Finding that "[the alternate interpretation] would impose New York's statutory regime for brewer-wholesaler relations on agreements consummated and completed on the other side of the globe simply because the wholesaler was licensed under New York law" Judge Glasser elected to follow the rubric that "a court should construe legislative enactments to avoid constitutional difficulties if possible. [Citations omitted.]" *Ibid.* This led to the conclusion that since under the terms of the contract there in issue physical delivery of the beer was made at the Balkola brewery at St. Petersburg, Russia, no sale took place in the State of New York which would justify an application of §55-c.[3]

_____

[3] Molson contends that the specific finding of the *Baltica* case that under the

9

Based on the foregoing, I find that the §55-c's requirement that "a national or regional policy of consolidation" result in "... a contemporaneous reduction in the number of a brewer's wholesalers not only for a brand in this state <u>but also for a brand in contiguous states or in a majority of the states in which the brewer sells the brand</u>" (§55-c(2)(e) (i)(A) (emphasis supplied) constitutes facially an effort to regulate "conduct beyond the boundaries of the State" (*Healy*, 491 U.S. 336, quoting *Brown-Forman*), and therefore that this portion of the statute is barred by the Commerce Clause.

### The Molson USA Consolidation Policy is
### Reasonable, Non-Discriminatory, and Essential

Molson asks rhetorically exactly what kind of consolidation could qualify as reasonable and essential under §55-c if the Molson consolidation does not. While declamatory, its argument points to a relevant consideration: in enacting §55-c, the New York legislature must be deemed to have concluded that some consolidations *would* qualify as reasonable and essential. While, admittedly, expressions of intent by individual sponsors and post-passage memoranda are

terms of delivery there applicable delivery of the beer took place outside the State of New York entitles it to dismissal here, and Molson "reserves the right" to introduce evidence at any subsequent hearing that Ryan took delivery outside the State of New York. No evidence was presented at the evidentiary hearing tending to show that delivery to Ryan took place outside New York. In addition, Molson states in its Pre-hearing Memorandum (p. 3) that "Molson USA ships Molson products to Ryan in New York." In light of the disposition below, it appears unnecessary to reach Molson's argument on this point.

10

not reliable indicators of the intention of the entire legislature, see *Schrader v. Carney*, 188A.D.2d 200, 206-207, 586 N.Y.S.2d 687, 691 (4th Dep't 1992), the introducers' memorandum suggests an intention to avoid "subjective, arbitrary, or retaliatory terminations." There has been no evidence in the present case that Molson's efforts to terminate the Ryan relationship have been actuated by such motivations. Perhaps more importantly, principles of statutory interpretation dictate an effort to interpret a regulatory statute to reach a result that is not unreasonable.

To the contrary, Molson has submitted uncontested evidence of a good-faith effort to fashion its consolidation policy around compliance with the rather technical requirements of §55-c. Molson has further demonstrated the need to reduce costs because it has in fact lost substantial (*i.e.*, multimillion-dollar) sums in four of the last five years. See Finding of Fact No. 38, *infra*. In interpreting a statute governing commerce, it would seem unreasonable to reach without a very good reason a result imposing continued operation of a business for years at substantial annual losses.

The present decision is not the end of this matter. §55-c 7 of the ABC allows Molson to terminate its distributor agreement with Ryan only upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of its consolidation policy, together with fair and reasonable compensation for other damages suffered. In the event that the parties are unable to agree on the amount of that compensation, such compensation will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

11

## FINDINGS OF FACT

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006, hereby makes the following findings of fact.

1.      Molson beer products are brewed in Canada by Molson, Inc. and sold in the United States by Molson USA, LLC ("Molson USA"), which contracts with distributors to sell beer to both on-premise retailers (such as taverns and restaurants) and off-premise retailers (such as grocery stores and convenience stores). Molson is North America's oldest brewer, founded in 1786.

2.      Molson USA is a limited liability company owned by Coors Brewing Company ("Coors") and Molson, Inc. It began operating in 2001 for the purpose of distributing Molson beer products in the United States. (At the time Molson USA was known as Molson 2000, LLC. It subsequently changed its name to Molson USA, LLC)

3.      Beer is sold in the United States through what is referred to as a "three-tier" distribution system. A brewer sells to independent distributors (or wholesalers) who sell to retailers, both off-sale, such as liquor and grocery stores and on-sale, such as bars and restaurants. State law prevents a brewer from selling directly to retailers or from owning wholesalers. A brewer is only as good as its distributors, since the brewer relies upon distributors to get products to retailers.

4.      In today's market Anheuser-Busch has approximately a 50% share of the national market. Miller's national share is approximately 20%. Coors' national share is

12

approximately 10%. The national shares of Heineken and Corona are 3% and 4% respectively.

5.      There are multiple distributors in every market. Each distributor carries multiple brands. Since retail shelf space and beer taps are limited, there is intense competition among distributors for "distribution" of beer brands and packages, meaning the share of the retailer's facility. Wholesalers also want to get brands placed in preferred spots in the distributor's facility, such as high traffic areas. The bigger a supplier is within a distributor's business the more likely that the supplier will have a greater share of the distributor's attention, known in the industry as "share of mind."

6.      Prior to 2001, the distribution of Molson products in the U.S. was done by a subsidiary of Miller Brewing Company under joint venture with Molson, Inc.

7.      John G. Ryan, Inc. is a New York beer distributor with a principal place of business in Pine City New York. It currently is a distributor for Molson beer products and other brands, including Miller, Guinness, Bass, Sam Adams and Seagrams. Its territory for Molson products includes the New York counties of Chemung, Schuyler, Tompkins and parts of Steuben and Yates.

8.      Since 2001, when Molson USA took over the United States distribution of Molson products, Coors Brewing Company has assisted with the sales and marketing of Molson products in the United States.

9.      Coors began a national policy of consolidation in 1997, focused on obtaining economically viable distributors. In many cases, this involved joining Coors and Miller in the same distributor's portfolio.

10.     In February, 2005, various Coors and Molson entities were combined into

13

what was loosely referred to as a "merger of equals." After the combination, Adolph Coors Company was renamed Molson Coors Brewing Company.

11.   In connection with the unwinding of the prior Miller Brewing Company distribution of Molson products, Molson USA promised Miller in 2000 that existing United States Molson distributors would be allowed the opportunity to continue distributing Molson and a provision of the distribution agreement would contain a provision by which Molson USA would not terminate without cause during the first five years.

12.   In a meeting in Canada prior to the operation of Molson USA, Gerald Ryan heard Daniel O'Neil of Molson, Inc. assure distributors that they would not be terminated if they were performing. Mr. O'Neil did not indicate whether this position would be adopted by the proposed joint venture between Coors and Molson or for how long the status quo would continue.

13.   Mr. Ryan did not testify that his distributorship did anything differently in the intervening six years that he otherwise would not have done in reliance on Mr. O'Neil's comments. Likewise Mr. Ryan did not testify that his distributorship elected not to do something that it would have done in reliance on Mr. O'Neil's comments.

14.   When Molson USA started its operations following the termination of the Miller joint venture, Molson USA could not locate a prior distributorship agreement with Ryan. Therefore, Molson USA created a Molson Amendment for Ryan with a blank exhibit. This was the first written agreement between the newly formed Molson USA and Ryan.

15.   Gerald Ryan signed the Molson Amendment "under protest" and returned the agreement to Coors on February 2, 2001 with a letter noting the protest. He did this after

14

consulting with counsel.

16.    Molson USA refused to accept the amendment with the protest. Counsel for Molson USA, Neal Peters, returned the Molson Amendment to Ryan on February 12, 2001 with a memo that indicated that Ryan should return the signed Molson Amendment with no alteration and without protest or not at all.

17.    Gerald Ryan then signed the Molson Amendment and returned it on March 1, 2001. Mr. Ryan, however, prepared a memo to file noting his protest, but also stating that the protest was not conveyed to Molson USA.

18    When Mr. Ryan sent the Molson Amendment back to Molson USA he intended to create a contract with Molson USA concerning the operation of his distributorship for Molson products.

19.    Molson USA does not know whether or not the Molson Amendment signed by Ryan was signed by anyone on behalf of Molson USA in 2001 or 2002. A search of the Molson USA records does not show one way or another.

20.    On October 28, 2002, Molson USA wrote to Ryan and offered Ryan the opportunity to sign an entirely new Molson distributorship agreement. In that letter, Molson USA acknowledged the previous receipt of Ryan's signed Molson Amendment. Molson USA has no record that Ryan ever signed the new Molson distributorship agreement.

21.    In June 2005, Molson USA discovered that it did not have in its files a Molson Amendment signed by both Ryan and Molson USA. Molson signed another copy of the Molson Amendment on June 27, 2005 and attached the signature page with the demand for arbitration. The full Molson Amendment was sent to Ryan on August 29, 2005

22.    Both Ryan and Molson USA did business from 2001 onward operating under the terms of the Molson Amendment.

23.    The Ryan agreement with Molson USA states that it is terminable without cause, except for the first five years during which termination is permitted only for cause and except for any statutory limitation or expansion of the right to terminate.

24.    When Molson USA began the importation and sale of Molson products in 2001, the joint venture partners Molson and Coors determined to consolidate, where possible, the distribution of Molson products into the Coors distribution network in the United States.  This has been Molson USA's continuous policy since the formation of Molson USA.

25.    When Molson USA began, there were over 502 Molson distributors in the United States and of these, 65% were not also Coors distributors  (referred to from time to time as "unaligned" or "Molson-only" distributors).  As of the hearing, there were 452 total Molson distributors.  From 2001 to July 18, 2006 the total number of Molson distributors decreased in 24 states.  There were 8 states in which the total number of Molson distributors increased.  In 19 states the number of Molson distributors stayed the same, but in 10 of these states there was only one distributor to begin with.  Molson could not reduce its distributors to zero and still operate in those ten states.  In the five states contiguous to New York, during this period, the total number of Molson distributors has decreased from 41 distributors to 24 distributors, while declining in three states and remaining the same in two states.

26.    In New York, the proposed termination of Ryan's distributorship agreement would not cause any reduction in the total number of Molson distributors, but the proposed termination of the other Molson-only distributors in New York would cause the total

16

number of distributors to decrease from nine to five.

27.    Molson USA used a number of tactics in carrying out its plan of consolidation. Beginning in 2001, Molson USA began attempting to persuade unaligned Molson distributors to voluntarily sell the Molson brands to the local Coors distributor. This process proved to be very successful. Over time, Molson USA also used the availability of new brands (although Ryan received all new brands) and the prospect of the appointment of a second Molson distributor (in one state) to encourage consolidation.   Molson distributors in Michigan, Pennsylvania, New York and Ohio resisted voluntary consolidation.

28.    Molson USA implemented its consolidation program with consideration given to the fact that the company was also attempting to grow sales of the Molson brands in the United States. Molson USA sought to recover from the double digit declines the brand suffered during the period when the brands were distributed in the United States by Miller. Molson USA invested over 20 million dollars per year in promoting the Molson products. Sales of Molson products in New York constitute approximately 30% of Molson USA's sales of Molson products in the United States.

29.    Molson's consolidation plan included the targeting of specific groups of distributors for consolidation in each year.  Originally, Ryan was not on the list of targeted distributors.

30.    "Targeting" a distributor referred to the focus and immediacy of the consolidation efforts for that distributor.  If a distributor was not a target for a particular year, it did not mean that Molson USA did not wish to consolidate the brands of that distributor into the local Coors distribution house.  Rather, given the business demands of selling Molson products,

17

it simply meant that the distributor was not the subject of focus by the Coors wholesaler development staff to promote consolidation.

31.    At a point in time in later 2002, Ryan was put on the target list for consolidation. In 2003, Ryan was contacted by a representative of Coors who asked Ryan to consider selling the Molson brands to the local Coors distributor. Mr. Ryan did not testify that termination of the distributorship was an option discussed by the Coors representative.

32.    Ryan, together with other New York distributors, retained counsel to communicate with Molson USA concerning Molson request that Ryan and others voluntarily sell the Molson distribution rights to the local Coors distributors.

33.    Following the merger of Molson and Coors in February, 2005, Molson USA took the first formal step to invoke the consolidation provisions of New York ABC §55-c. On March 11, 2005, Molson Coors sent to all U.S. distributors (except three in Ohio), including Ryan and the other unaligned New York Molson distributors, a notice informing the distributors that Molson Coors would be taking further steps to effect the consolidation of the Molson brands into the local Coors distributors. Molson USA was not able to locate any prior written notice to all of the New York Molson distributors informing them of the Molson USA consolidation process.

34.    Prior to the beginning of 2006, Molson USA made no distinction in its expenditures for marketing and promotion based upon whether a distributor was aligned with Coors. Following the merger of Coors and Molson a decision was made to increase advertising and marketing support for Coors Light. This reduced the amount of funds available to promote Molson products. Molson USA decided to reduce the amount of funds available for media

18

spending and reduced the number of markets in which media spending would be done. Whether a distributor was aligned with Coors was a part of the decision making process concerning media spending. Ryan did not receive any media spending in his market in 2005 so there was no reduction in 2006. As to "tactical spending" (promotions, point of sale materials, and other similar in-market expenditures) each Molson distributor, including Ryan, regardless of whether the distributor was aligned or unaligned, was given the same amount of tactical spending in the distributor's market as had been allocated in 2005.

35 In May, 2005 Dean Valdez of Molson Coors visited with Mr. Ryan in New York. Mr. Valdez indicated that as the result of the Molson/Coors merger, the likely support for Molson brands would be decreased because of an overall corporate decision to increase marketing support for Coors Light. He indicated that it would be an opportune time for Ryan to consider selling to the local Coors distributor because the value of the distributorship might fall as a result of declining brand sales. Valuation of beer distributorships is typically done on the basis of trailing 12 month performance. Mr. Ryan declined to sell the distributorship in response to Mr. Valdez's comments. There is no evidence that the decision to place more corporate resources in support of the Coors Light brand was done in order to have an effect upon the Molson consolidation or an effect upon New York Molson only distributors, including Ryan.

36. This arbitration was commenced on July 22, 2005. This is a test case for Molson, rather than commencing simultaneous actions against all unaligned New York Molson distributors. Molson USA seeks an award declaring that under §55-c, Molson has the right to terminate its Distribution Agreement with Ryan pursuant to Molson USA's policy of consolidation.

19

37.     Molson USA informed all of the other New York Molson-only distributors
that it was the intent of Molson USA to pursue similar termination proceedings with respect to
each New York distributor in the event that Molson USA was permitted by the arbitrator to
terminate Ryan as a Molson distributor, with an appropriate payment for the brands.

38.     Molson USA's financial statements show that it suffered financial losses,
as follows:

39.     Consolidation of the Molson distribution into the Coors distribution
houses has a number of substantial benefits.  At the most elemental level, consolidation of the
distribution of Molson into the Coors distributors has allowed Coors and Molson USA to have
fewer personnel calling on fewer distributors.  This has saved Molson USA and Coors several
million dollars, apart from the benefits accruing from the merger between Coors and Molson.
This reduction also permits field personnel to concentrate their efforts among fewer distributors,
which means that there is more time to spend with each distributor.

40.     Molson Coors obtained costs savings, sometimes referred to as the
synergies from the merger, but there were separate and distinct cost savings realized from the
elimination of Molson USA employees in the Molson sales network attributable to the
consolidation policy and not the merger.  The head count for the Molson USA sales force went
from 35 people calling on only Molson USA distributors to the current 15 people who are "fully
integrated with Coors," meaning that they call on distributors for both Coors and Molson brands

20

in a network that is 85% aligned.

41.     Consolidation of the Molson and Coors brands in a single distributor also permits both Molson USA and the distributor to increase selling focus on the combined Molson/Coors brands because they constitute a greater overall share of the distributor's business. In the beer business, this is referred to as "share of mind," meaning the ability to convince the distributor to focus on the supplier's brands, instead of diluting efforts across the distributor's entire brand portfolio, which can involve dozens of different brands. For example, the distributor can offer joint promotions to retailers. Instead of having to spend a day with the Molson-only distributor, and then a day with the Coors distributor in the same market, the Molson Coors employees are thus able to serve both brands during a single visit and coordinate the various corporate programs with a single distributor. Also, in a single call the distributor can ensure that the Coors and Molson brands are fresh on the retailer's shelves, thus promoting the important freshness imperative for both Coors and Molson.

42.     Consolidation also assists in creating a larger portfolio for the Coors distributor so that the distributor is in a better position to convince retailers to devote greater shelf space or number of taps to the combined Coors/Molson products. The Coors distributor has an incentive to promote both products to a greater degree.

43.     Consolidation has also shown that over time (and on average) aligned Molson distributors outperform unaligned Molson distributors in sales of Molson products. Some unaligned Molson distributors may outperform some aligned distributors and during some periods the average sales performance of unaligned distributors may exceed that of aligned Molson distributors. Short term sales performance can be affected by several matters, including

21

such factors as weather, a hockey strike, or changes in performance by a relatively few number of distributors.

## CONCLUSIONS OF LAW

The undersigned arbitrator, having considered the pre-hearing and post-hearing submissions of the parties, the exhibits and the testimony of the witnesses who appeared at the hearing in this matter on July 17-18, 2006 hereby makes the following conclusions of law.

1. Both by signed document and course of dealing the parties have manifested an intent no later than March, 2001 to be bound by the Molson Amendment, as embodied in Exhibit 88.

2. Inasmuch as there is no evidence that Molson USA attempted to terminate Ryan or communicated to Ryan its intention to terminate the distributorship contract between them pursuant to §55-c prior to one year before the commencement of this arbitration proceeding, Molson USA has satisfied the terms of paragraph 6.2 of the Molson Amendment, which requires that a dispute be submitted to arbitration within one year of the date that the dispute first arose.

3. The proposed termination of the distributorship agreement between Molson USA and Ryan is governed by the provisions of §55-c including the 2001 amendments to §55-c which were effective June 15, 2001.

4. Molson USA's national plan of consolidation is "reasonable, nondiscriminatory and essential" within the meaning of §55-c.

5. Molson USA's national plan of consolidation is nondiscriminatory because it has been in effect since 2001 and has been pursued steadily since that date. Molson's decision to

stage its consolidation efforts consistent with the limitations of state law and the need to operate its business does not constitute discrimination. Molson has stated its intention to pursue the termination of the remaining unaligned distributors in New York if termination is permitted in this arbitration. There is no contrary evidence suggesting otherwise and, thus, the commencement of this arbitration as a test case is not discriminatory within the meaning of §55-c. The term "nondiscriminatory" in the statute refers to the policy of consolidation and not to the staged implementation of the policy for legitimate business reasons.

6.    In interpreting the meaning of the terms "reasonable" and "essential" in §55-c, reference is made to cases interpreting the same terms in the Wisconsin Fair Dealership Law, Wis. Stat. §135.02(4)(a).

A.    The terms reasonable and essential must be construed together within the context of the statute. In order for a national plan of consolidation to be reasonable and essential under §55-c the brewer need not risk financial ruin if the plan is not implemented or completed.

B.    Instead, the plan of consolidation is reasonable if it is the product of the brewer's good faith rational business judgment, which can be shown if it is consistent with industry practice.

C.    In order to be essential, the plan of consolidation must be not merely incidental or desirable, but necessary for the proper functioning of a brewer's distribution network.

D.    Factors such as cost savings to Molson USA and its corporate parent Molson Coors Brewing Company, avoidance of financial losses, increases in distributor efficiency and focus on the Molson brands that contribute to increased revenues satisfy the

23

requirement that a plan be reasonable and essential.

7.      Section 55-c(3) requires that a beer distributorship agreement "may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided that brewer has acted in good faith." The statute defines good faith as "honesty in fact and the observance of reasonable commercial standards in the trade." In the context of this arbitration good faith is to be determined in connection with the decision to terminate and the implementation of the termination of Ryan.

A.      A brewer does not fail to act in good faith in implementing a plan of consolidation over time. State law and the need to run a business permit a brewer to achieve its consolidation in stages.

B.      A brewer also does not fail to act in good faith by utilizing lawful means to encourage consolidation, such as selectively awarding brands or planning to "dual" brands in a territory or monitoring sales performance.

C.      Ryan has presented no evidence that Molson USA did not act with "honesty in fact" in connection with the implementation of the policy of consolidation.

(1)      The 2000 remarks of Daniel O'Neil do not show dishonesty in fact on the part of Molson USA. Molson USA had yet to be formed. Moreover, Mr. O'Neil's statement does not constitute a promise of any type. Nothing about any statement by Mr. O'Neil of present intention on the part of Molson, Inc. has any impact on the honesty of Molson USA's decision to invoke §55-c nearly five years later. Even after the meeting with Mr. O'Neil, Ryan signed the 2001 Molson Amendment with the five year termination provision. Ryan has also not presented any evidence that it would have done anything different in reliance between the time of

24

Mr. O'Neil's remarks and the announcement by Molson USA of its policy of consolidation.

(2)     Molson USA's encouragement of Ryan to sell in May, 2005 was based upon a factual statement that Molson Coors' support for the Molson brands would decrease as part of an overall company strategy. Molson USA's statement that this would provide an opportune time for Ryan to sell since less marketing support could lead to lesser revenues was not false.

(3)     Molson USA's proposed statements to distributors as to future actions beyond the expiration of the "five year period" was an honest statement of intention, given the legal impediments to forced consolidation faced by Molson USA and the need to continue Molson USA's business with distributors. In any event, there is no evidence that Ryan was ever contacted and presented with these statements.

D.     Ryan has presented no evidence that Molson USA has acted contrary to the observance of reasonable commercial standards in the trade. The only evidence of commercial standards in the trade was provided by Molson USA concerning the consolidation by Stroh Brewing Company.

E.     Molson USA has acted in good faith concerning the termination of Ryan.

8.     Section 55-c requires that a brewer's policy of consolidation "shall have previously been disclosed, in writing, in reasonable detail to the brewer's wholesalers . . ." In addition, "[a]ll affected wholesalers and affected brewers shall be afforded ninety days prior notice of the implementation of the policy." The obvious purpose of these provisions is to provide adequate notice to distributors who will be terminated under the consolidation policy. The notice period is not a maximum period, but a minimum period.

25

A. In this case, Ryan has been provided more than 90 days notice of Molson USA's policy. The policy was described in writing at least as early as 2003 as a result of correspondence between the attorneys for Molson USA and Ryan. The policy was described in reasonable detail because it is elementally simple: Molson USA desired that the Molson brands be represented by the local Coors distributor.

B. In addition, Molson USA provided a description of its policy and notice of implementation in its letter of March 1, 2005, which was sent to Ryan and all other New York wholesalers.

C. Finally, Ryan has also had notice of Molson USA's intent to terminate and the description of the policy by virtue of the arbitration demand in this case, which was filed in July, 2005. Molson USA has not terminated Ryan and more than 90 days have elapsed from the date of the commencement of the arbitration.

9. Under §55-c, a brewer's policy of consolidation must "result in a reduction in the number of a brewer's wholesalers not only for a brand in this state, but also for a brand in contiguous states or in a majority of states in which the brewer sells the brand." The term "contemporaneous" must be interpreted in a reasonable fashion given the New York legislature's knowledge of the laws restricting terminations in nearly every other state. A brewer could not possibly accomplish consolidation through persuasion in a short time period. The evidence in this case suggests that a national policy of consolidation takes considerable time, given the restrictions of state law and the need to conduct ongoing business. Thus, "contemporaneous" in the context of §55-c means that consolidation is measured over the period of time that the consolidation policy is in effect.

26

10.     That portion of §55-c which conditions termination of a New York distributor on actions of the brewer outside of New York is not enforceable under the Dormant Commerce Clause of the United States Constitution. *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 576 (1986); *Healy v. The Beer Institute, Inc.*, 491 U.S. 324 (1989). New York has made the operation of §55-c dependent upon the brewer's activities in other states, which has the practical effect of regulating commerce occurring wholly outside of the borders of the state of New York. The inability of Molson USA to compel or persuade distributors to consolidate in contiguous states or in a majority of other states would operate as an effective bar to the brewer's right to invoke the provisions of §55-c and this extra-territorial trigger is not permitted under the Commerce Clause.

11.     Even if the out-of-state conditions of §55-c were to be enforced, Molson USA has complied with the provisions of the Act.

A.     Molson USA's uncontested evidence showed that the number of Molson distributors in states contiguous to New York has been reduced since the adoption of the policy of consolidation by Molson USA. The statute uses the term "in contiguous states," to mean the total number of distributors in those states, not measuring the results in each state. At the commencement of the policy there were 38 Molson distributors in contiguous states and there were 28 distributors in contiguous states at the time of the hearing.

B.     In addition, on a national basis, Molson USA began its operations with only one distributor in each of ten states. Because a brewer may not be expected to reduce its distributors to less than one in any given state (given that a brewer may not sell direct to retailers, but must sell through a distributor), the calculation under 55-c should not consider these states.

27

Given this, Molson USA has used its consolidation policy to reduce the number of Molson distributors in a majority of the states of the United States, reducing the number of Molson distributors in 24 states, increasing or remaining the same in 17 states.

      C.     While the number of distributors in New York will not be reduced with the termination of Ryan and the splitting of Ryan's territory among two distributors (one of whom already carries the Molson brands), the implementation of Molson's consolidation policy in New York, as desired by Molson USA, will reduce the number of distributors from nine to five and thus complies with the provisions of §55-c pertaining to New York distributors.

      12.     Molson USA is entitled to an award declaring that it has the right under all applicable law to terminate its distributor agreement with Ryan upon payment of the fair market value of the distribution rights which will be lost or diminished by reason of the implementation of such policy, together with the fair and reasonable compensation for other damages suffered pursuant to §55-c 7. In the event of failure of the parties to agree to such compensation, such matter will be determined during the second phase of this arbitration proceeding, currently scheduled to commence on December 12, 2006 at 10:00 a.m. at the offices of the Association.

_Nov 6  2006_
Date

_____
Peter M. Collins

I, Peter M. Collins, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Nov 6  2006_
Date

_____
Peter M. Collins

## AMERICAN ARBITRATION ASSOCIATION

### COMMERCIAL ARBITRATION TRIBUNAL

. MOLSON USA, LLC,

Claimant,

vs.

Case No. 13 181 2798 05

JOHN G. RYAN, INC.,

Respondent.

### AWARD, INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named parties and dated January 2, 2001, and having been duly sworn, and having duly heard the proofs and allegations of the Parties do hereby, AWARD, as follows:

The undersigned arbitrator rendered an award in Phase I of this arbitration proceeding concluding that Molson USA, LLC ("Molson USA") had adopted and implemented a plan of consolidation constituting good cause of termination of the distributorship agreement and relationship with the respondent, John G. Ryan, Inc. ("Ryan"). That award, dated November 6, 2006, is incorporated herein as a partial basis for the second phase of this proceeding to determine, pursuant to New York Consolidated Statutes 55-c7(a), the amount of compensation due to Ryan for the termination of Ryan's Molson distribution rights.

Evidence was taken in this matter on April 26 and 27, 2007. Ryan presented documentary evidence and testimony of Andrew Christon and Jerry Ryan. Molson presented the

Page 1 of 7

testimony of William H. Beyer, Richard Carroll, Gary Styles, and Lamont Seckman. The parties

have each presented post-hearing memoranda and reply memoranda. Submissions in this

arbitration proceeding have been closed.

The final award in this matter shall include the following Findings of Fact and

Conclusions of Law.

### FINDINGS OF FACT

1.  Both parties in this proceeding presented the testimony of expert witnesses

who valued the distribution rights of Ryan using a valuation methodology referred to by various

terms, but frequently by the term "discounted future cash flow" ("DFCF"). The methodologies

of Ryan's expert, Andrew Christon, and Molson's expert, Lamont Seckman, in calculating DFCF

were similar, but not identical.

2.  Each expert's DFCF calculation was premised upon a projection of sales of

Molson products in Ryan's territory for a period of years into the future. Mr. Christon's period

was ten years, beginning January 1, 2007, and Mr. Seckman's period was for seven years

beginning on the same date. Neither expert was critical of the choice of the other's projection

period.

3.  One of the key areas of dispute between the experts was the expected

performance of the Molson brands in Ryan's territory in the future. Mr. Christon projected that

Molson sales would essentially flatten out for the ten year projected period, while Mr. Seckman

projected a continued gradual decline in Molson sales during his projected period.

4.  The evidence supporting Mr. Christon's view on future Molson performance

can be summed up in his phrase that the people running Molson Coors Brewing Company are

smart people and would not let future brand declines continue.

5.  Mr. Christon also pointed to Molson's efforts to repackage the Molson product to appear more "Canadian." Molson contends that there is no evidence that these efforts have been or will be successful. However, it appears elementary that Molson would not have undertaken these efforts unless it hoped to benefit from them. While it may be difficult or impossible to forecast the magnitude of the improvement, the makeover effort may be expected to improve sales.

6.  On the other hand, Molson produced substantial evidence suggesting that the downward trend of the Molson brand was likely to continue. Among the factors supporting this conclusion are Molson Coors Brewing Company's ("MCBC") concentration of spending and support on the key Coors Light, Keystone and Blue Moon brands, the concentration of Molson U.S. spending in metropolitan markets, the reduction of Molson SKUs ("stock-keeping units") and the upward change in the pricing of Molson products to import levels. This latter strategy would likely have a disproportionately negative effect in the more economically challenged areas of New York, such as Ryan's territory. While it is not known how much each or all of these factors will impact sales of Molson products in Ryan's market, cumulatively they appear likely to cause a continuation of the downward trend.

7.  In the absence of proof showing the likelihood of positive change, the best guide for future performance is past performance. Therefore, I believe that Mr. Seckman's projections of volume are more likely to occur.

8.  Both experts' calculations of DFCF reached an incremental profit calculation by subtracting the cost of goods sold and incremental costs that would be avoided by Ryan by the loss of the Molson brand rights. The future incremental lost profits were reduced by the application of a discount rate. Mr. Christon's discount rate was 11.17%, and Mr. Seckman's

Page 3 of 7

discount rate was 14.59%. Both experts used a technique known as the "weighted average cost of capital" method of calculating their discount rate.

9.  I find Mr. Seckman's calculation of the discount rate to be more credible and applicable to the present circumstances. A potential buyer of distribution rights for an individual brand is at a greater risk than the buyer of an entire distributorship, given the moderating effect of multiple brands within a distribution house, as some brands grow and others decline. The buyer of the distribution rights of an individual brand will expect a pay-back in a short period of time. Thus, even if the hypothetical buyer of the Molson distribution rights were to finance the entire purchase, over the projected DFCF period the balance of debt-to-equity invested in the brands more nearly approaches the 80% equity/20% debt assumed by Mr. Seckman in his model.

10. There was a dispute between the experts on how the "terminal value" calculation would be made. A terminal value calculation seeks to value the brand rights at the end of the projection period. Mr. Christon suggests that the volume number for the last year of the projection period should be used for the terminal value calculation. Mr. Seckman takes an additional year of declining performance to reach the next year, which is the beginning of the terminal value calculation. Molson introduced a text by McKinsey & Co. (Ex. M-30) supporting Mr. Seckman's view of the terminal value calculation. While Mr. Christon suggested that his methodology was supported by a noted expert in the field, he provided no documentation of this view. Therefore, I adopt Mr. Seckman's methodology.

11. Mr. Seckman also analyzed several other Molson brand sale transactions to do a "reality check" of his DFCF calculation. Mr. Christon did not examine any comparable transactions, even those in his company's database of transactions. The result of Mr. Seckman's examination of the Molson database (Ex. M-12) was to increase the valuation from his DFCF

calculations. It appears to me that other transactions could be useful as a reality check for the fair market value of the Molson brands.

12. There was evidence of other transactions also from a summary of Mr. Christon's database (Ex. M-26) and from an industry consultant, Joe Thompson (Ex. R-17). Each of these exhibits support Mr. Seckman's view of valuation.

13. In sum, I am convinced that the valuation proposed by Molson should be adopted in general for the purposes of my award in this arbitration. Mr. Seckman's report concludes with a range of values which, when rounded, range from a low of $700,00.00 (2.59 times 2006 gross profits) to $780,000.00 (2.90 times 2006 gross profits)(Ex. M-2, p. 22). Molson proposes a computation of value midway between the two, i.e. $740,000.00. Because I believe a valuation lower than 2.9 times 2006 gross profits would undervalue the distribution rights, I conclude that a value at the higher end of Mr. Seckman's range is appropriate here. Accordingly, I conclude that the fair market value of the Molson distribution rights held by Ryan is $780,000.00, the higher number in Mr. Seckman's range.

14. Ryan put on evidence of other damages that will be suffered by the distributor as a result of the proposed termination. Molson has agreed with Ryan's calculation that the out-of-pocket damages are $7,517.95.

### CONCLUSIONS OF LAW

1.    Ryan has the burden of proof in this phase of the hearing, including both the burden of going forward with the evidence and the risk of non-persuasion.

2.    Under New York law, expert testimony must be supported by an adequate factual basis and not be based upon conjecture or speculation. Here, Mr. Christon's projection of future sales as a part of his calculation of DFCF is based upon his speculation as to what

MCBC's management and Molson's management will do in the future to reverse the trend of lower sales in Ryan's market and the larger beer marketplace. Because the opinion is based upon speculation, Ryan has failed in its burden of proof.

3.      Even if Mr. Christon's opinion were considered to have an adequate basis in fact, I would conclude that in weighing all of the factors, including the credibility of witnesses, the likelihood of future events portrayed by both parties, Ryan's track record of Molson performance, and my assessment of the merits of the methodologies of both experts, Molson's projection of value better estimates the fair market value of Ryan's Molson distribution rights under §55-c7(a).

4.      As to the determination of "other damages sustained" under §55-c7(a), I do not accept the argument of Ryan and Mr. Christon that the difference between Mr. Christon's valuation of Ryan's Molson distribution rights and his calculation of fair market value (resulting from the application of a lack of marketability discount) constitutes the type of damages contemplated by the New York legislature.

5.      When the statute refers to "other" damages, it should be construed to refer to matters other than the value of the brand distribution rights, for which the legislature chose to define fair market value in §55-c2(i). Moreover, it would be illogical for a supplier to be required to pay more for the termination of the brands for good cause pursuant to the implementation of a national plan of consolidation (§55-c7(a)) than for an outright termination without cause (§55-c7(b)).

6.      Rather, in my view, the damages provided in addition to fair market value of the terminated brand distribution rights are those sunk costs which the distributor has been unable to recoup or will be unable to recoup after the termination of the brand distribution rights.

      7.    Therefore, by applying §55-c7(n) to the facts I have determined in this case, the following is my declaratory award:

      a.    Per my award of November 6, 2006, Molson is entitled under all applicable law to terminate its agreement with the respondent Ryan upon notice to Ryan and payment to Ryan in the amount of $787,517.95.

      b.    Per the application of §55-c7(c), the costs and arbitrator compensation of this arbitration shall be divided equally between Molson and Ryan. Accordingly, the administrative fees of the American Arbitration Association totaling $5,000.00, and the compensation of the arbitrator totaling $86,318.00 shall be borne equally by the parties. Therefore, Ryan shall reimburse Molson the sum of $2,250.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Molson.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

 

    July 13, 2007                  _Peter M. Collins_
    Date                               Peter M. Collins

      I, Peter, M. Collins, do hereby affirm upon my oath as an Arbitrator that I am the individual described in and who has executed this instrument which is my Award

    July 13, 2007                  _Peter M. Collins_
    Date                               Peter M. Collins